# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIA del ROSARIO, on behalf of and as Guardian and Parent of GWENDOLYN BURKE, <br> Plaintiff, <br><br> v. <br><br> NASHOBA REGIONAL SCHOOL DISTRICT, and BUREAU OF SPECIAL EDUCATION APPEALS, <br> Defendants. | CIVIL ACTION <br> No. 19-40107-TSH |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
### December 5, 2019

HILLMAN, D.J.

## Background

Maria del Rosario, on behalf of and as Guardian and Parent of Gwendolyn Burke ("Plaintiff") has filed a Complaint against Nashoba Regional School District ("Nashoba") and the Bureau of Special Education Appeals ("BSEA"): (1) appealing the BSEA's decision as against the weight of the evidence; (2) appealing the hearing officers BSEA decision on the grounds that it was invalidated by procedural, statutory, constitutionals; (3) seeking reimbursement of attorney's fees and costs from Nashoba; (4) asserting a claim for damages against Nashoba for discrimination in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C, § 794; (5) asserting a claim for damages under the federal civil rights act, 42 U.S.C § 1983 against Nashoba for violation of Gwendolyn Burke's due process rights; and (VI) seeking

equitable relief in the form of an injunction enforcing the outstanding portion of the BSEA decision by ordering Nashoba to arrange for an immediate, independent vocational and daily living evaluation of Gwendolyn Burke at the "LABBB Collaborative."

This Memorandum and Order addresses Plaintiff's Motion For A Preliminary Injunction Enforcing An Order Of The Bureau Special Education Appeals Against Defendant Nashoba Regional School District (Docket No. 4).

## Standard of Review

It is well-settled law that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Voice Of The Arab World, Inc. v. MDTV Medical News Now*, *Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). While all four factors must be weighed, the moving party's likelihood of success on the merits is "the touchstone of the preliminary injunction inquiry." *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998). "[I]f the moving party *cannot* demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Maine Educ. Ass'n*, 695 F.3d at 152 (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)) (emphasis added).

The moving party bears the burden of proof for each of these four factors. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). Where all parties agree as to the basic facts of a dispute, a court "is free to accept as true well-pleaded allegations in the complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction." *Avaya v. Ali*, Civ.Act. No. 12-10660-DJC, 2012 WL 2888474 (D.Mass. Jul. 13, 2012) (citing *Rohm &*

*Haas Elec. Materials, LLC* v. Elec. Circuits Supplies, Inc.*,* 759 F.Supp.2d 110, 114 n. 2 (D.Mass. 2010)) (internal quotations omitted). However, where there is significant dispute as to the underlying facts, "the propriety of injunctive relief hinges on determinations of credibility." *Id.* (internal quotations omitted). In support of their relative positions, the parties relied on their written submissions and examination/cross-examination of the lone witness, Mr. Kelly, affidavits, exhibits and proffer of counsel.

**The Legal Landscape: Nashoba's duty to provide Gwendolyn with transition level skills, training, and vocational opportunities suited to her potential.**

Plaintiff is the court-appointed guardian of Gwendolyn Maria Burke. Nashoba is a duly chartered regional school district with a principal location in Bolton, Massachusetts. The "BSEA" is part of the Massachusetts Division of Administrative Law Appeals.

Gwendolyn is a highly functioning twenty-two-year-old on the autism spectrum with a documented diagnosis of learning disability. Gwendolyn is disabled as defined by one of more of the subsections of the Individuals with Disability in Education Act ("IDEA"), 20 U.S.C. §1400 *et seq.,* in accordance with federal and state law. As a result of her disabilities and because she and Plaintiff were residents of the school district encompassed and serviced by Nashoba, for almost two decades, Gwendolyn received special education services from Nashoba pursuant to federal and state statutes and regulations.

Under applicable federal and state statutes and regulations in effect, the school district where a child with a disability resides has financial and programmatic responsibility for providing that student's special education until the child reaches the age of twenty-two. Moreover, school districts are required to provide that student with a Free Appropriate Public Education ("FAPE") in the Least Restrictive Environment ("LRE") with meaningful parent

3

involvement in designing the student's individualized education program ("IEP")[1], including

placement options and other important procedural safeguards.  Additionally, federal regulations

require Nashoba to provide older disabled students such as Gwendolyn with a coordinated set of

services designed to be  within a results-oriented process, that is focused on improving the

academic and functional achievement of the child with a disability to facilitate the child's

movement from school to post-school activities, including postsecondary education, vocational

education, integrated employment (including supported employment), continuing and adult

education, adult services, independent living, or community participation. These mandated

transition services must be based on the individual child's needs, taking into account the child's

strengths, preferences, and interests; and includes:

(i)     Instruction;

(ii)    Related services;

(iii)   Community experiences;

(iv)    The development of employment and other post-school adult living
        objectives; and

(v)     If appropriate, acquisition of daily living skills and provision of a
        functional vocational evaluation.

Massachusetts regulation also require Nashoba to provide programs for older students to

ensure that options are available for them, particularly those eligible students of ages eighteen

---

[1] The term FAPE means a that the handicapped child shall receive educational instruction specifically designed to meet his or her unique needs, "supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Board of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89, 102 S.Ct. 3034 (1982).   The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with IDEA.

through twenty-one years. Such options include continuing education; developing skills to access community services; developing independent living skills; developing skills for self-management of medical needs; and developing skills necessary for seeking, obtaining, and maintaining jobs; developing skills to access community services; developing independent living skills; developing skills for self-management of medical needs; and developing skills necessary for seeking, obtaining, and maintaining jobs.

Under applicable federal and state law, a Massachusetts school district that is unable to provide a reasonably adequate FAPE in the LRE, including mandated transition services, is required to offer the student with a free out of district placement at another school that will provide them with such reasonably appropriate services.

### Background Facts[2]

#### Gwendolyn's Placement in Nashoba's Transition Program

From May of 2016, when she received a Certificate of Completion until she turned twenty-two in July of this year, Gwendolyn received special education services from Nashoba in its transitions program at the Nashoba Regional High School ("NRHS") in Bolton, Massachusetts. Nashoba's transition classroom is the place where its in-district special education students are placed after they turn eighteen until they reach the age of twenty-two.  There were no other non-special education students (typical peers) in the transitions classroom during Gwendolyn's placement.

Gwendolyn has demonstrated ability in and enthusiasm for baking and cooking and has a career objective of employment as a chef in a commercial bakery or restaurant. While she was a

---

[2] Additional facts will be included later in this Order in my discussion of various procedural issues and analysis of the merits.

student in its transitions program, Nashoba provided Gwendolyn with routine opportunities for developing her culinary skills and her vocational goals. More specifically, Nashoba provided Gwendolyn with special education services for developing her skills in cooking and baking in a home-style kitchen, with an ordinary stove and limited baking equipment, that is, a non-commercial setting. During the entire time Gwendolyn was in its transitions program, Nashoba failed to find employment for Gwendolyn, or any other post eligible transition special education students in commercial bakeries or restaurants performing baking or cooking. Instead, Nashoba placed Gwendolyn at a local business's cafeteria where she performed routine food preparation. In such settings, Gwendolyn was assigned menial tasks that she and Plaintiff felt were below her abilities and did not develop her transition level skills to her potential.

Since before 2016 and though the spring of 2018, Plaintiff met with the faculty and staff of Nashoba on an almost monthly basis to learn about Gwendolyn's progress, and she frequently expressed her strongly felt concern that Gwendolyn was not receiving adequate vocational training and off-site job opportunities in her chosen field of baking and cooking.

<u>Alternative out of district placement to which Gwendolyn was entitled in order to provide her a FAPE in the LRE</u>

During the relevant time period, the Minuteman Regional Vocational Technical School District ("Minuteman") offered a vocational education to high school students in its educational facility located in Lexington, Massachusetts, a half an hour's drive from Gwendolyn's home. Minuteman offered culinary arts vocational training in its classroom shops with commercial baking equipment and restaurant grade facilities. Gwendolyn could not be directly enrolled at Minuteman.

The "LABBB Collaborative" is a collaborative of Massachusetts municipal school districts, including Lexington, Arlington, Burlington, Bedford, and Belmont that was created to serve students with special education needs from the aforementioned base districts and approximately seventy sending districts. It services a wide range of students with disabilities from the age of three up to the age of twenty-two. The LABBB Collaborative also accepted out of district students at Minuteman who were entitled to take advantage of both that collaborative and that school district's vocational and academic programming when the referring school district paid a tuition for that student. Students in the LABBB Collaborative programming at Minuteman are offered vocational training and access to the same shop classroom facilities offered to Minuteman's directly enrolled students. The LABBB Collaborative programming at Minuteman offered vocational internships and off-site job training in commercial bakeries and restaurants performing actual cooking and baking. Upon completion of its enrolled students' programming at Minuteman, LABBB Collaborative students were provided with job placement services and opportunities in the culinary arts in commercial bakeries and restaurants, performing actual cooking and baking. The LABBB Collaborative also provided academic services to enrolled special education students, including, where appropriate, preparation for taking the Commonwealth's MCAS tests so that said students could earn a high school diploma.

Nashoba could have referred and placed Gwendolyn in the LABBB Collaborative programming at Minuteman, but refused to do so. From November of 2016 through September of 2018, Nashoba refused to even grant permission to Plaintiff and Gwendolyn to tour the LABBB Collaborative programing at Minuteman due to alleged restrictions contained in federal and state statutes and regulations. Starting in May of 2017, Plaintiff requested to refer

Gwendolyn for placement at another school where she could receive a FAPE which was reasonably suitable for her potential in the LRE, including the LABBB Collaborative programming at Minuteman. Nashoba failed to respond to such requests.

<u>Gwendolyn's BSEA Appeal</u>[3]

Pursuant to Massachusetts law, disputes between school districts and students and/or their parents regarding FAPE's in the LRE, including placement determinations, are submitted for resolution to the BSEA. On June 22, 2018, Gwendolyn and Plaintiff filed an appeal with the BSEA because Nashoba had refused to refer Gwendolyn for a publicly funded placement at the LABBB Collaborative programming at Minuteman ("BSEA Appeal"). The specific relief requested in the BSEA Appeal was placement in the LABBB Collaborative programming at Minuteman, transportation to that programming (as she was currently receiving to NRHS), and an award of compensatory services time after she reached the age of twenty-two. The appeal was assigned to BSEA Hearing Officer Sara A. Berman ("Berman" or "hearing officer").

The BSEA Hearing Rule II(A)(1) required that hearings in a BSEA appeal should be commenced within thirty-five days of the filing. However, Berman granted Nashoba's request – over objection --- to begin the hearings on September 13, 2018. On the first day of hearings, the LABBB Collaborative Executive Director, Patrick Barbieri ("Barbieri"), testified as to the opportunities afforded to suitable special education students who were referred, and then placed in its programming at Minuteman. Barbieri further testified that referring school districts paid his collaborative $ 61,000 a year for this out of district placement. By the morning of the second

---

[3] While Gwendolyn's mother has brought this action individually and, on her behalf,, both of her parents pursued the appeal before the BSEA. Because there is no substantive difference, I may at times use the term "Plaintiff" when referring to both of Gwendolyn's parents.

day of hearings, September 14, 2018, it had become reasonably clear that Gwendolyn was entitled to at least some of the relief that Plaintiff had requested. Late that morning, Joan DeAngelis, the Nashoba administrator in charge of its special education programming ("DeAngelis") and Nashoba's attorney agreed to settle Gwendolyn's BSEA Appeal by referring her for placement at the LABBB Collaborative programming at Minuteman.  Plaintiff believed from the context of these settlement discussions, that the referral was for a fully funded placement of Gwendolyn in the LABBB Collaborative programming at Minuteman and covered all aspects of the relief requested by Plaintiff in the BSEA Appeal, other than her claim for compensatory services time. Consequently, Plaintiff agreed to suspend and continue the hearings so that she could be placed in the LABBB Collaborative programming at Minuteman, leaving the issue of her entitlement to compensatory services time from Nashoba for a later hearing date.

After the hearings in Gwendolyn's BSEA Appeal were suspended on September 14, 2018, Plaintiff learned from a listed witness (Connie Benjamin) who was a former employee of Nashoba and was present and ready to testify that day, that prior to Nashoba's agreement to settle most of Gwendolyn's outstanding issues, she had informed Nashoba's attorney that she would be testifying to a number of occurrences which may have violated Gwendolyn's rights which she observed while she was working at Nashoba.[4]  As a result of the settlement reached on September 14, 2018, Plaintiff had released Connie Benjamin from testifying.

---

[4] These alleged violations included, but were not limited to, exposing Gwendolyn to the terrifyingly violent and disturbingly obscene behaviors of two other students in the transitions classroom, one of which regularly engaged in furious outbursts that caused students in the transition classroom to be cleared, and one of which constantly exposed himself and touched himself obscenely, often in full sight of the home-style kitchen where Gwendolyn was expected to perform on-site cooking and baking activities in the NRHS transitions classroom. These fellow students who exhibited violent and obscene behaviors had been removed from the transitions classroom shortly prior to the commencement of the BSEA Appeal for a change of placement.

During the six weeks following the agreement to settle, Plaintiff and Gwendolyn toured the LABBB Collaborative programming at Minuteman and leaned in greater detail about that programming's classroom shops and MCAS preparation offerings. Moreover, Gwendolyn was processed and approved by Nashoba for placement at the LABBB Collaborative programming at Minuteman. She continued to receive instruction from Nashoba during this time. By October 25, 2018, the LABBB Collaborative had processed Nashoba's referral for placement in its programming at Minuteman and was awaiting an acceptance letter from Nashoba to effectuate this agreed to placement. During this period, Plaintiff's attorney (Gwendolyn's father) made frequent requests of Nashoba's attorney to get Nashoba to act upon the acceptance letter and effectuate the settlement agreement.

. On November 1, 2018, Nashoba's attorney sent Plaintiff's attorney a proposed written "settlement agreement." Nashoba requested that Plaintiff and her attorney sign the written agreement before Nashoba would sign the acceptance letter and place Gwendolyn in the LABBB Collaborative programming. Under the terms of the written settlement agreement submitted by Nashoba, it would fund Gwendolyn's placement in the LABBB Collaborative programming at Minuteman, but Plaintiff would be required to supply Gwendolyn's transportation to this programming, waive her rights for compensatory services time after she reached the age of twenty-two, foreclose her rights in any future federal civil rights suit, and agree to the settlement's strict confidentiality.[5]

---

[5] Plaintiff's oft-repeated incredulity that she would be asked to sign a settlement agreement before Nashoba would place Gwendolyn at Minuteman, and that such agreement would include provisions other than what *she* understood the terms of settlement to be is *at best* puzzling particularly in light of the fact she was being represented by an experienced attorney (regardless of whether that attorney was familiar with BSEA appeals). Plaintiff's further contention that she believes Nashoba agreed to place Gwendolyn at Minuteman with no quid pro quo, that is, while she retained the right to pursue all of her other claims/remedies is disingenuous.

It was Plaintiff's belief on September 14, 2018 that hearings in the BSEA Appeal were continued so that the issue of compensatory time could be considered and decided later. Plaintiff asserts that she did not expect a request to waive compensatory time as condition of Gwendolyn's placement. On or about November 6, 2018, Plaintiff's attorney filed an emergency motion with hearing officer Berman requesting an immediate telephone conference to address the conditions Nashoba was seeking as part of the settlement agreement. Berman held a telephone conference on November 7, 2018 with the parties' legal counsel. Berman told the Plaintiff that she could not require Nashoba to comply with commitments allegedly made in an unwritten settlement agreement, She, therefore, scheduled further hearings, which took place between November 28, 2018 and lasted through March 27, 2019.

Minuteman had given notice to the LABBB Collaborative at the beginning of the 2018-2019 school year that it would not renew that collaborative's contract for programming in the following school year. Thus, when the hearings reconvened, for all intents and purposes, placing Gwendolyn in the LABBB Collaborative programming at Minuteman would no longer be an option. Therefore, at the continued hearings, Nashoba focused on providing Gwendolyn with transition level skills in the transition classroom at NRHS during the 2018-2019 school year. At this point, Nashoba had somewhat modified the services it was providing to Gwendolyn in its transition program and had partially upgraded its faculty and staff to provide these special education services. Nashoba also emphasized Gwendolyn's so called "soft skills" deficits, that is, her frustration with Nashoba faculty and staff. Nashoba maintained that its faculty and staff needed to work with Gwendolyn on soft skills and that these seemingly took precedence over other transition levels skills mandated by federal and state statutes and

regulations. Plaintiff and other Nashoba current and former employees testified at the continued

hearings that Gwendolyn's social skills deficits were caused by her frustration with the menial,

non-culinary tasks she was forced to perform each school day for over three years, her lack of

confidence in Nashoba's programming that she believed was not preparing her for employment

in her chosen field, and her prior exposure to terrifyingly violent and disturbingly obscene

behaviors by other Nashoba students.

<u>The Hearing Officer's refusal to order an evaluation of Gwendolyn at the
LABBB Collaborative programming at Minuteman.</u>

Nashoba failed to conduct a school-based evaluation of Gwendolyn's vocational and

independent living skills during the entire time she was enrolled in its transitions program.

The only written report Nashoba offered into the record of the BSEA Appeal

was not a formal evaluation but an observation conducted in February of 2017 by an

independent contractor.  IDEA and its implementing federal and state regulations required

Nashoba to conduct formal, school-based evaluations of Gwendolyn's functional vocational and

independent living skills at least annually.

BSEA Hearing Rule X(A)(12) invested Berman with the authority to "[o]rder additional

evaluations [of Gwendolyn] at public expense." Plaintiff filed a motion in the BSEA Appeal in

which she requested that a temporary evaluation be conducted in the LABBB Collaborative

Programming at Minuteman. In support, she asserted that the only fair and effective method for

assessing Nashoba's conclusion regarding Gwendolyn's social skills deficits was to evaluate

how she performed in the LABBB Collaborative programming at Minuteman. In addition to

filing the motion for a temporary evaluation, Plaintiff's attorney requested an administrative

subpoena be served upon the High School Program Director of the LABBB Collaborative to

testify at the next hearing date. Specifically, they sought testimony regarding their credentials and experience in performing such evaluations, whether the collaborative routinely performed such evaluations, the cost for conducting such an evaluation, and the procedures for ordering such a referral.

At the reconvened hearing on January 23, 2019, Plaintiff's attorney suggested that the evaluation could be completed in no more than forty-five days. Berman denied Plaintiff's request for the LABBB Collaborative to conduct an evaluation of Gwendolyn and refused to take testimony from the LABBB Collaborative High School Program Director, giving as a reason, in part, that she did not intend to suspend the hearings for the evaluation to be conducted. Plaintiff was unable to directly engage and pay the LABBB Collaborative to conduct a temporary evaluation of Gwendolyn because it was a collaborative of other municipal public-school district and could only conduct temporary evaluations upon a request of the school district or an order from a BSEA hearing officer.

The hearings in Gwendolyn's BSEA Appeal were originally scheduled to be completed on January 23, 2019. Connie Benjamin was unavailable to testify that day and only a rebuttal witness for Nashoba was scheduled to testify that afternoon. Around noon, Berman notified the parties that her son had been hospitalized on an emergency basis and she terminated the proceedings for the rest of that day. The hearings did not resume until March 25, 2019, although Plaintiff's attorney made repeated requests that they recommence earlier. Berman also denied Plaintiff's repeated applications to renew her motion for a temporary evaluation of Gwendolyn during the two months prior to the hearings resuming.

<u>The Continuation of Gwendolyn's BSEA Appeal and The BSEA Decision.</u>

On March 25, 2019, Connie Benjamin testified on behalf of the Plaintiff. Berman issued her decision on May 17, 2019 (the "BSEA Decision"). She concluded that the "Parents did not meet their burden of demonstrating that the IEPs and placement provided by Nashoba were inappropriate." She also determined that she could "not conclude that Nashoba and LABBB committed procedural violations warranting an award of compensatory services." At the same time, she did find that Gwendolyn was entitled to a transitional evaluation and ordered "therefore, that Nashoba, in collaboration with Parents, shall arrange for a comprehensive transitional evaluation of Student, which shall include a thorough assessment of Student's current vocational skills, needs, and interests, particularly in her preferred field of cooking and baking." She further ordered that the evaluation commence immediately upon the parties' receipt of her decision. Plaintiff and her attorney received the BSEA Decision on May 20, 2019.

## Discussion

Gwendolyn is an individual with a disability[6] who was eligible for special education and related services pursuant to IDEA and the Massachusetts special education statute, Mass.Gen.L,, ch. 71B ("Chapter 766") and, therefore, was entitled to a FAPE in a program capable of providing her meaningful educational benefits in the LRE[7]. While parents and adult students, such as Gwendolyn, are entitled to participate in the IEP process, they cannot dictate the terms of the IEP and schools have professional discretion and flexibility in how they fulfill their

---

[6] She has been diagnosed with Autism Spectrum Disorder and Attention Deficit Hyper-Activity Disorder (ADHD).

[7] Under federal law, at a minimum, the child is entitled to "instruction and support services sufficient to permit [her] to benefit educationally from that instruction." *Nickerson-Roti v. Lexington Pub. Schools,* 893 F.Supp.2d 276, 285 (D.Mass. 2012)(citation to quoted cases and internal quotation marks omitted). Under Massachusetts law, the child is entitled an education "that assures the maximum possible development." *Id.* (citation to quoted case and internal quotation marks omitted).

obligation to provide the student with a FAPE within the least restrictive environment ("LRE"). The IEP may be challenged by a student or parent by seeking a hearing before the BSEA. Any party aggrieved by the BSEA's decision may seek judicial review of such decision, including an order of compliance for a decision that is not being implemented. *See Michelle K. v. Pentucket Reg'l Sch. Dist.*, 79 F.Supp.3d 361, 369 (D. Mass. 2015)( BSEA has jurisdiction to resolve disputes under IDEA and Section 504; BSEA's decision may be appealed to state or federal court.)

### Exhaustion of Administrative Remedies

Before addressing the merits of the Plaintiff's motion, I will address the issue of whether she has exhausted her administrative remedies such that her request for injunctive relief is properly before this Court. This proceeding is in a unique position in that Plaintiff is not seeking to overturn the BSEA's decision that Gwendolyn receive a transitional evaluation, but rather is trying to enforce that order. In the Court's view, the most sensible approach would be to remand this matter to the BSEA hearing officer for ruling. However, the Plaintiff contends that the BSEA haring officer has effectively abandoned the case and therefore, it is incumbent on this Court to enforce the decision. In order to put the Plaintiff's position into perspective, I will briefly summarize the proceedings before the BSEA.

On May 17, 2019, the BSEA hearing officer issued a decision in which she ordered that Gwendolyn receive a transitional evaluation by an out of district entity arranged by collaboration between the parties. Within a week[8], the parents filed an emergency motion requesting that the

---

[8] The motion itself is dated August 14, 2019, However, it is clear from the substance of the motion that it was filed prior to May 24, 2019. Moreover, in a subsequent submission, Gwendolyn's parents state that the motion was filed with the BSEA, via fax, on May 22, 2019.

BSEA hearing officer order Nashoba to comply with the decision by referring Gwendolyn *to the LABBB Collaborative f*or the transitional evaluation.[9] On May 30, 2019, the BSEA hearing officer denied the request after finding that, in timely compliance with her order, Nashoba had undertaken to reach out to different providers who might be capable of completing the transitional evaluation. On May 30, 2019, the same day that the BSEA hearing officer issued her decision denying the motion, the parents filed a *renewed* emergency motion in which they again requested that Gwendolyn be immediately referred to the LABBB Collaborative for a transitional evaluation[10]. In support, they stated that they "only have confidence in the LABBB Collaborative to conduct the comprehensive vocational evaluation." In a May 31, 2019 letter to the BSEA hearing officer, the parents stated that if the evaluation were not completed by June 12, 2019, it would become "moot," because the LABBB Collaborative's affiliation with Minuteman will have ended.

On June 25, 2019, Gwendolyn's parents filed a "re-renewed" request for an emergency motion against requesting that Gwendolyn be immediately referred to the LABBB Collaborative. Nashoba's counsel responded by informing the hearing officer that it had selected two entities to conduct a transitional and vocational assessment of Gwendolyn: Seven Hills and Easter Seals. She further indicated that Nashoba and Gwendolyn's parents could not mutually agree as which entities should conduct the transitional evaluation and therefore, a further hearing was necessary.

---

[9] It bears repeating that is apparent from the submissions to the BSEA that the parents have at all times taken the position that the only appropriate placement for Gwendolyn for educational services and the transitional evaluation is the LABBB Collaborative. This remained true even after the LABBB Collaborative ended its affiliation with Minuteman Vocational Technical High School and it was unclear what services LABBB Collaborative could provide as an alternative. Counsel for the Plaintiff (Gwendolyn's father) tried to walk back this position at the hearing, but the written record makes clear that his contention that he and the Plaintiff always has been willing to discuss alternative appropriate placements suggested by Nashoba rings hollow.

[10] From the parents' later submissions, it appears that they inexplicably filed the renewed motion *before receiving* the BSEA hearing officer's denial of the initial motion.

In a follow up communication, Gwendolyn's counsel acknowledged to the BSEA hearing officer that Easter Seals and Seven Hills are reputable agencies. However, he was unfamiliar with how they would conduct the required vocational assessment and that is the reason that he had his wife were requesting that the assessment be done at the LABBB Collaborative. Counsel indicated that if the hearing officer did not immediately order that the evaluation be done at the LABBB Collaborative, that entity "will no longer even be the most meaningful option." The BSEA hearing officer did not rule on the renewed emergency motion or the "re-renewed" emergency motion.

Plaintiff argues that the BSEA hearing officer has abandoned or "abdicated" her role in the case and therefore, she has fully exhausted her administrative remedies. However, a careful reading of all the submissions indicates that Gwendolyn's parents made clear to the hearing officer that if she did not order the evaluation take place at the LABBB Collaborative by the middle of June, then it would no longer be an option. Put another way, the parents essentially informed the hearing officer that their request that Gwendolyn's evaluation be conducted by the LABBB Collaborative was moot. It is only before this Court that Plaintiff has revived the LABBB Collaborative as a viable option utilizing the LABBB Collaborative's recent affiliation with Corporate Chefs. On this record, I do not find that the hearing officer "abdicated" her responsibility. Instead, the parents in effect informed her that there was no longer anything to decide. The Plaintiff now takes the position that given Gwendolyn's age the BSEA no longer has jurisdiction to address this matter and therefore, it is rightfully before this Court. Given that Nashoba has not argued to the contrary, I will assume that it agrees that remand to the BSEA hearing officer would be futile and/or is no longer an option.

<u>Determining which Entity should conduct the Transitional Evaluation</u>

When reviewing an agency decision under the IDEA, this Court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Nickerson-Reti*, 893 F.Supp.2d at 285 (quoting 20 U.S.C. § 1415(i)(2)(C). The court must give "due weight" to the agency's decision and the burden is on the complaining party to show the agency's decision was wrong. *Id.* Therefore, I will briefly summarize the BSEA hearing officer's relevant findings of fact, her decision, and the parties' positions as to whether and/or how that decision should be implemented.

After Gwendolyn received a certificate of completion upon finishing the twelfth grade at Nashoba, she required additional services, *i.e.,* transition services, until she reached the age of twenty-two. The IDEA defines "transition services" as follows:

> The term "transition services" means a coordinated set of activities for a child with a disability that—
>
> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
>
> (B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
>
> (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401 (34).  Gwendolyn's parents were satisfied with the education that she received until approximately May 2017 when she was placed in the Nashoba transitions program. Gwendolyn's parents ultimately objected to that program on the grounds that it was not adequately preparing Gwendolyn to achieve her long-term goal of obtaining employment in a commercial baking/cooking setting.  More specifically, Gwendolyn's parents felt that Nashoba's transitions program lacked commercial cooking equipment, staff with the culinary expertise, and did not provide her the opportunity to practice in a large-scale food preparation and baking environment.  Instead, Gwendolyn had been placed in the same job sites for three years doing mundane and monotonous tasks that were not improving her baking/cooking skills. Gwendolyn's parents took the position that she should be placed in the LABBB Collaborative and sought approval from Nashoba to permit them to tour the LABBB Collaborative facilities and engage in talks with LABBB Collaborative personnel about Gwendolyn being placed in that program.[11]  Nashoba, on the other hand, asserts that at all times, it provided Gwendolyn with appropriate services which meet IDEA's requirements. While the program did not expose Gwendolyn to a commercial baking setting, it did provide her with the skills in "interpersonal relations," workplace behavior, self-regulation, and independences that would help her succeed in *any* employment situation.[12]  Additionally, the program did expose her to food preparation and

---

[11] Apparently, the LABBB Collaborative took the position that it needed approval from Nashoba to engage with Gwendolyn and her parents.  Whether Nashoba's cooperation was legally required for the LABBB Collaborative to engage with Gwendolyn and her parents and whether Nashoba committed procedural violations in connection therewith, thus entitling Gwendolyn to compensatory services, are issues that are outside the scope of Plaintiff's motion for injunctive relief.

[12] Nashoba emphasized the improvement of such "soft skills" in Gwendolyn's IEP given that her disabilities affected her ability to communicate, learn and interact socially, which lead to problems in the employment context.  More specifically, Gwendolyn struggles when asked to perform tasks she doesn't like, with accepting criticism or feedback and making rude comments to others—all of which hinder her ability to work as part of a team.  The IEP put in place by Nashoba was intended to address these issues.

baking. When Nashoba refused to place Gwendolyn in the LABBB Collaborative, her parents filed a hearing request with the BSEA.

In a detailed, thoughtful, and comprehensive opinion, the BSEA hearing officer rejected Gwendolyn's parents' contention that the IEPs and placement provided by Nashoba were inappropriate and further rejected their contention that procedural irregularities by Nashoba and the LABBB Collaborative entitled Gwendolyn to compensatory services. At the same time, the hearing officer concluded that Gwendolyn was entitled to "a comprehensive transitional evaluation … which shall include a thorough assessment of [her] current vocational skills, needs and interests, particularly in her preferred field of cooking and baking." Limiting my ruling to the issues raised by the Plaintiff's motion for preliminary injunction, I find that the BSEA Decision ordering a comprehensive transitional evaluation of Gwendolyn must be upheld. Unfortunately, the hearing officer left it to Nashoba and Gwendolyn's parents to "collaborate" to arrange the evaluation, which is to be "conducted by a mutually-agreed-out of district entity." This is unfortunate because since the BSEA decision was issued on May 17, 2019, the parties have been unable to reach agreement as to the entity which is to conduct the evaluation. Before turning to that issue, I will address the parties' divergent viewpoints regarding how I should make that decision.

The Plaintiff seemingly takes the position that the Court should simply review the evidence and determine independently whether to have Gwendolyn evaluated by the LABBB Collaborative or Nashoba's choice, Easter Seals and Seven Hills. Moreover, she argues that Nashoba has acted in bad faith and dragged out these proceedings and therefore, in essence, forfeited the right to contest that the LABBB Collaborative is the appropriate entity to conduct

the evaluation.  Nashoba, on the other hand, has a different view as to the standard this Court should apply in making its determination. Nashoba asserts that under the governing law, Gwendolyn's evaluation, which was required every three (3) years was not due until the fall of 2018. In November of 2018, Nashoba sought Gwen/s parents' consent to conduct the evaluation, but no record of consent exists. During that time period, the parties were in the midst of negotiating a potential transfer to an out-of-district school and therefore, no evaluation was conducted.  Nashoba asserts that under the statutory scheme, if the public agency (Nashoba) believes that the evaluation is necessary, and the parent refuses consent, the agency may, but is not required to, pursue the evaluation utilizing the IDEA's consent override procedures. According to Nashoba, there is no state law authority that permits parents to override a public agency's decision to conduct an evaluation. Therefore, Nashoba argues, regardless of whether the BSEA decision is stayed or overturned. it will have the unilateral authority to conduct the evaluation in accordance with federal law and override the parents' refusal to consent.  For the following reasons Nashoba further argues that the outcome should be the same even if the Court enforces the BSEA Decision regarding the evaluation.

Nashoba points out that the only relief sought by the Plaintiff in her motion is that the Court order that the evaluation be conducted only at the LABBB Collaborative, and that the evaluation focus primarily on vocational skills in cooking and baking.  In support of its contention that it should choose the evaluator, Nashoba asserts that through research and investigation it has determined that the LABBB Collaborative is an inappropriate venue for the evaluation and has proposed that two other qualified entities, Easter Seals and Seven Hills, would be better suited for the skills enumerated in Gwendolyn's IEP that must be evaluated.

Moreover, Nashoba points out, the BSEA Decision does not require that the parties mutually agree, only that the parties "collaborate." Since the BSEA Decision does not elaborate as what should happen if the parties cannot agree and since they have reached an impasse, Nashoba argues that under federal law they have the right to override the parents' refusal to consent. Therefore, argues Nashoba, it *must* be given the right to determine the evaluating entity.

After reading the parties' submissions and after asking for additional briefing on the standard of review, and reviewing the applicable law cited by them, I remain somewhat unsure as to the appropriate standard which I should apply to determine which entity should conduct Gwendolyn's evaluation. Under the circumstances, I find that the best and fairest course of action is simply to choose that entity which will best fulfill the ruling made by the BSEA hearing officer and assist Gwendolyn in her future endeavors, which should be the crux of everyone's concern.

<u>The Comprehensive Transitional Evaluation shall be conducted by the LABBB Collaborative</u>

*Factual Findings Regarding The Parties' Proposed Transitional Evaluations*

Plaintiff proposes that Gwendolyn's transitional evaluation take place at the LABBB Collaborative. Nashoba proposes that the transitional evaluation be performed by Easter Seals, which would administer a transition evaluation of Gwendolyn and Seven Hills which would administer a vocational assessment with particular emphasis on culinary skills.

*The LABBB Collaborative*

James Kelly ("Kelly"), high school program director for the LABBB Collaborative testified at the PI hearing about how the program would conduct a transitional evaluation of Gwendolyn. The LABBB Collaborative performs up to 50 to 70 comprehensive transitional

evaluations annually for special education students. A "handful" of such evaluations every year are for students who have expressed a desire for specialization within the transitional assessment, for example, a vocational component focusing on the culinary arts such as Gwendolyn has specified in this case. As part of the evaluation, the LABBB Collaborative performs several tests, including interest inventory, skill set and academic testing. Situational assessments are done in the environment of a student's particular vocational specialty or interest. Additionally, assessments are done by the family, staff and the student.

Gwendolyn has met with staff members of the LABBB Collaborative and Kelly believes that they possesses a fair understanding of Gwendolyn's vocational needs and transitional goals. Part of Gwendolyn's transitional evaluation would take place at Corporate Chef which is a work site including a commercial kitchen that LABBB Collaborative has an arrangement with and utilizes daily. An LABBB Collaborative transitional counselor would oversee this part of the assessment which would evaluate Gwendolyn as she worked in the kitchen directly with that staff member as well as Corporate Chef staff. [13] More specifically, Gwendolyn would be observed engaging in a "multitude of tasks" in a commercial kitchen which has industrialized size ovens, stoves, mixers, cleaning areas and working areas. Corporate Chef prepares the food to serve throughout the day in a cafeteria/restaurant setting to employees of several businesses with nearby facilities. Corporate Chef also prepares food for special events held outside the main dining area. Both the LABBB Collaborative counselor and the Corporate Chef staff would provide feedback about Gwendolyn. Kelly believes that Gwendolyn would benefit from being

---

[13] LABBB Collaborative counselors and staff are professionals employed by the program who generally have a Masters Degree in special education or vocational training and/or a counseling background. Kelly was not aware of the background or training of the Corporate Chef staff.

assessed in such an environment because Corporate Chef's kitchen replicates what one would expect to find in a typical commercial baking/cooking setting, including working with peers and staff members. The vocational assessment would address employability in the field of commercial baking and cooking. Such an assessment would include an evaluation of Gwendolyn's social skills, job preparedness, work readiness, worker traits, worker ethics, social navigation skills, social problem solving, self-advocacy within the work environment skills, and how she communicates with colleagues. The LABBB Collaborative has experience in finding employment for special education students. However, student placement is not a "mission" of the LABBB Collaborative, that is, it is not a goal for the program to assist transitional students in obtaining employment.

Kelly represented that conducting the evaluation of Gwendolyn should take no more than a few days with the observation of her at the Corporate Chef facility taking no more than two academic length days and would cost about $1,500. It would take the LABBB Collaborative approximately a week or two to prepare a written report of its transitional evaluation of Gwendolyn. The report would identify types of jobs which Gwendolyn would be best suited for which could include specializations or vocations outside of the culinary field.

The LABBB Collaborative is currently developing a program for students over the age of twenty-two focused on developing overall independent living skills, but as of this date, nothing is in place. It is not clear whether that program will at some point offer programs in the culinary field, or the extent to which that program will have vocational component to it.

*Seven Hills and Easter Seals*

Nashoba has proposed that the transitional evaluation of Gwendolyn be conducted by two entities: Easter Seals and Seven Hills. Easter Seals would conduct a transitional assessment of Gwendolyn while Seven Hills would conduct a vocational assessment—the vocational assessment would focus on the culinary field.

Easter Seals will identify Gwendolyn's abilities, interests, capabilities, strengths, needs, potentials and behaviors within the areas of person/social functional/academic, community/independent, employment and employability areas. Additionally, Easter Seals will assess Gwendolyn's: (1) self-determination in terms of her self-awareness, decision-making skills, disability identity, and self-advocacy skills; (2) determination of her career development to find out where she stands in terms of career awareness, orientation, exploration, preparation, placement, or growth/maintenance; and (3) ability to live independently by assessing her knowledge of independent living tasks, experience with community tasks, and financial management. Easter Seals will conduct the transitional assessment at NRHS.

Seven Hills will provide a functional assessment of Gwendolyn in the culinary field which is designed to prepare participants for a variety of food-related jobs in the community. Seven Hills will conduct the assessment at the Nashoba transitions program in the on-site kitchen, which is the same kitchen Gwendolyn has used in the past. Seven Hills chose this location because Gwendolyn is familiar with the set-up, that is, she knows the location of the ingredients, baking tools and other equipment and is familiar with how to operate such equipment. Because of Gwendolyn's familiarity with the setting, in theory, Seven Hills will be better able to assess her culinary skills. As part of its assessment, Seven Hills will make

recommendations to Gwendolyn to assist her in developing and fostering core skills and vocational attributes necessary for social and vocational independence.

It will take about twelve hours for Easter Seals and Seven Hills combined to conduct the vocational/transitional assessments. Generally, each assessment takes about three hours and it takes another three-four hours to write up the report. As part of their assessments, Seven Hills and Easter Seals will transition planning to help Gwendolyn prepare to enter post-school environments. Additionally, both Easter Seals and Seven Hills provide services to students over the age of twenty-two years old and provide work to learn and job training opportunities to assist with post-graduation planning.

<em>Analysis</em>

Based on the record before me, it is my observation that the failure to reach a final settlement which would have permitted Gwendolyn to attend the LABBB Collaborative in Fall 2018 cannot, as Plaintiff contends, be placed solely on Nashoba. Additionally, both parties must shoulder the blame for the current impasses regarding the completion of the transitional evaluation. Contrary to what Plaintiff's attorney (Gwendolyn's father) said at the hearing, it is more than evident that Plaintiff's position that the only entity that she finds acceptable to conduct Gwendolyn's transitional evaluation is the LABBB Collaborative. Nashoba has also dug in its heels and has refused to approve sending Gwendolyn to the LABBB Collaborative for evaluation despite the fact that it will cost roughly the same or less to have the LABBB Collaborative conduct the evaluation than to have it conducted by Easter Seals and Seven Hills. Nashoba's reasoning, that Easter Seals and Seven Hills will provide a more comprehensive vocational evaluation, and that these entities provide placement services has considerable merit. However, Nashoba's

contention that the evaluation take place in an environment with which Gwendolyn is more familiar rather than a setting akin to a commercial kitchen is, in the context of this case is disingenuous and undermines their choice of Easter Seals/Seven Hills as the most appropriate entities to evaluate Gwendolyn in her chosen field of *commercial* backing. That being said, I do not find that Nashoba has been acting in bad faith. On the contrary, having reviewed both parties' proposals, I find that evaluations proposed by Easter Seals and Seven Hills would meet many of the requisite criteria and would be more suitable in some areas than the LABBB Collaborative evaluation in that it would provide a more comprehensive assessment of Gwendolyn's overall vocational skills. and would be better able to assist Gwendolyn in finding future employment. The LABBB Collaborative, on the other hand, appears much more focused on evaluating Gwendolyn's cooking skills and it is unclear how much assistance it will give Gwendolyn in finding future employment. Although it is a close call, in upholding the BSEA Decision, I cannot ignore that the BSEA hearing officer ordered that Gwendolyn undergo a comprehensive updated transitional evaluation with an emphasis on assessment of her vocational skills. While not explicit, reading the BSEA Decision as a whole, it is reasonable to infer that it requires that the evaluation focus primarily on her skills and instructional need in the field of cooking and baking. On this record, the LABBB Collaborative is the by far the superior entity to conduct such an evaluation given that the evaluation will be conducted in a commercial baking/cooking setting. For that reason, I am ordering that Gwendolyn's comprehensive transitional evaluation be conducted at the LABBB Collaborative. I want to make clear, however, that had Easter Seals and Seven Hills proposed conducting the evaluation in a commercial kitchen setting, I would have ruled differently.

### Injunctive Relief is Warranted; Terms Of Preliminary Injunction

There can be no dispute that Plaintiff is likely to succeed on the merits of her claim that she is entitled to a comprehensive transitional evaluation: Nashoba acknowledges the same and it was ordered by the BSEA hearing officer. I find that Gwendolyn will be irreparably harmed if the evaluation is not conducted and done so forthwith. I further find that the balance of equities tips in Plaintiff's favor, and that an injunction is in the public interest. Accordingly, an injunction shall enter as follows:

The parties *shall* arrange for a comprehensive transitional evaluation of Gwendolyn conducted at the LABBB Collaborative at the earliest possible date. Nashoba shall bear the expense of the evaluation, including transportation costs.

## Security

This Court's rules of procedure provide in relevant part that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c). Therefore, Plaintiff shall post a bond or cashier's check in the amount of $2,500 to cover the costs and damages, if any, sustained by any Defendant if found to have been wrongfully enjoined or restrained.

## **Conclusion**

Plaintiff's Motion For A Preliminary Injunction Enforcing An Order Of The Bureau

Special Education Appeals Against Defendant Nashoba Regional School District (Docket No. 4)

\is ***granted***, as provided in this Order.


**SO ORDERED**


*/s/* ***Timothy S. Hillman***
TIMOTHY S. HILLMAN
DISTRICT JUDGE