# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **MARIA del ROSARIO, on behalf of and as Guardian** | ) | |
| **and Parent of GWENDOLYN BURKE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **No. 19-40107-TSH** |
| | ) | |
| **NASHOBA REGIONAL SCHOOL DISTRICT, and** | ) | |
| **BUREAU OF SPECIAL EDUCATION APPEALS,** | ) | |
| **Defendants.** | ) | |

_____)

## MEMORANDUM OF DECISION AND ORDER
**November 24, 2020**

**HILLMAN, D.J.**

## Background

Maria del Rosario, on behalf of and as Guardian and Parent of Gwendolyn Burke

("Plaintiff")  has filed a Complaint against Nashoba Regional School District ("Nashoba") and

the Bureau of Special Education Appeals ("BSEA"): (1) appealing the BSEA's decision as

against the weight of the evidence (Count I); (2) appealing the hearing officer's decision on the

grounds that it was invalidated by procedural, statutory, and constitutional errors (Count II); (3)

seeking reimbursement of attorney's fees and costs from Nashoba (Count III); (4) asserting a

claim for damages against Nashoba for discrimination in violation  of Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C, § 794 (Count IV); (5) asserting a claim for damages under

the federal civil rights act, 42 U.S.C § 1983 against Nashoba for violation of Gwendolyn Burke's

due process rights (Count V); and (6) seeking equitable relief in the form of an injunction

enforcing the outstanding portion of the BSEA decision by ordering Nashoba to arrange for an

immediate, independent vocational and daily living evaluation of Gwendolyn Burke at the

"LABBB Collaborative." (Count VI)[1]

This Memorandum and Order addresses Defendant Nashoba Regional School District's

Partial Motion To Dismiss (Docket No. 38) pursuant to which Nashoba seeks to dismiss Counts

III, IV and V of the Complaint. For the reasons set forth below, that motion is *granted*, in part

and *denied*, in part.

### Standard of Review

On a Rule 12(b)(6) motion to dismiss, the Court "must assume the truth of all well-

plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v.*

*Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175

F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the plaintiff must state a claim that

is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007).

That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level,

... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."

*Id.* at 555, 127 S.Ct. 1955 (internal citations omitted). The standard "requires more than labels

and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more

than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662,

678, 129 S.Ct. 1937 (2009) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1855).  Dismissal is

appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is

---

[1] The Court has previously granted Plaintiff's motion for injunctive relief. *See* Memorandum and Decision of Order dated December 5, 2019 (Docket No. 42)("PI Decision").

entitled to relief." *Ruiz Rivera v. Pfizer Pharm.*, LLC, 521 F.3d 76, 84 (1st Cir. 2008) (internal

quotations and original alterations omitted).  "The relevant inquiry focuses on the reasonableness

of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in

the complaint." *Ocasio-Hernàndez v. Fortuño-Burset,* 640 F.3d 1, 13 (1st Cir. 2011).

<u>**Facts**</u>[2]

**General Background**

<u>Interested Parties</u>

Plaintiff is the court-appointed guardian of Gwendolyn Maria Burke ("Gwendolyn").

Nashoba is a duly chartered regional school district with a principal location in Bolton,

Massachusetts. The "BSEA" is part of the Massachusetts Division of Administrative Law

Appeals. Gwendolyn is a highly functioning twenty-two-year-old on the autism spectrum with a

documented diagnosis of learning disability.  Gwendolyn is disabled as defined by one or more

of the subsections of the Individuals with Disability in Education Act ("IDEA"), 20 U.S.C.

§1400 *et seq.*  Under applicable federal and state statutes and regulations in effect, the school

district where a child with a disability resides (in Gwendolyn's case, Nashoba) has financial and

programmatic responsibility for providing that student's special education until the child reaches

the age of twenty-two. Accordingly, for almost twenty years Gwendolyn received special

education services from Nashoba pursuant to federal and state statutes and regulations

summarized below.

<u>Provision of  a Free Appropriate Public Education</u>

School districts are required to provide students with a Free Appropriate Public

Education ("FAPE") in the Least Restrictive Environment ("LRE") with meaningful parent

---

[2] Additional facts will be included later in this Order in my discussion of various procedural issues and analysis of the merits.

involvement in designing the student's individualized education program ("IEP")[3], including

placement options and other important procedural safeguards.  Additionally, federal regulations

require Nashoba to provide older disabled students such as Gwendolyn with a coordinated set of

services designed to be  within a results-oriented process. That process is focused on improving

the academic and functional achievement to facilitate the child's movement from school to post-

school activities, including postsecondary education, vocational education, integrated

employment (including supported employment), continuing and adult education, adult services,

independent living, or community participation. These mandated transition services must be

based on the individual child's needs considering the child's strengths, preferences, and interests;

and includes:

> (i)      Instruction;
>
> (ii)     Related services;
>
> (iii)    Community experiences;
>
> (iv)    The development of employment and other post-school adult living
>          objectives; and
>
> (v)     If appropriate, acquisition of daily living skills and provision of a
>          functional vocational evaluation.

Massachusetts regulations also require Nashoba to provide programs for older students to

ensure that options are available for them, particularly those eligible students of ages eighteen

through twenty-one years. Such options include continuing education; developing skills to access

---

[3] The term FAPE means a that the handicapped child shall receive educational instruction specifically designed to meet his or her unique needs, "supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Board of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89, 102 S.Ct. 3034 (1982).   The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with the IDEA.

community services; developing independent living skills; developing skills for self-management

of medical needs; and developing skills necessary for seeking, obtaining, and maintaining jobs;

developing skills to access community services; developing independent living skills; developing

skills for self-management of medical needs; and developing skills necessary for seeking,

obtaining, and maintaining jobs.

Under applicable federal and state law, a Massachusetts school district that is unable to

provide a reasonably adequate FAPE in the LRE, including mandated transition services, is

required to offer the student a free out of district placement at another school that will provide

them with such services.

### Transition Services Nashoba Provided To Gwendolyn

After Gwendolyn received a certificate of completion upon finishing the twelfth grade at

Nashoba, she required additional services, *i.e.,* transition services, until she reached the age of

twenty-two. The IDEA defines "transition services" as follows:

> The term "transition services" means a coordinated set of activities for a child
> with a disability that—
>
> (A) is designed to be within a results-oriented process, that is focused on
> improving the academic and functional achievement of the child with a disability
> to facilitate the child's movement from school to post-school activities, including
> post-secondary education, vocational education, integrated employment
> (including supported employment), continuing and adult education, adult services,
> independent living, or community participation;
>
> (B) is based on the individual child's needs, taking into account the child's
> strengths, preferences, and interests; and
>
> (C) includes instruction, related services, community experiences, the
> development of employment and other post-school adult living objectives, and,
> when appropriate, acquisition of daily living skills and functional vocational
> evaluation.

20 U.S.C. § 1401 (34).

From May of 2016, when she received a Certificate of Completion until she turned twenty-two in July 2019, Gwendolyn received special education services from Nashoba in its transitions program at the Nashoba Regional High School ("NRHS") in Bolton, Massachusetts. Nashoba's transitions classroom is the place where its in-district special education students are placed after they turn eighteen until they reach the age of twenty-two.  There were no other non-special education students (typical peers) in the transitions program during Gwendolyn's placement.

Gwendolyn's parents were satisfied with the education that she received until approximately May 2017. They ultimately objected to Gwendolyn's placement in the transitions program on the grounds that it was not adequately preparing her to achieve her long-term goal of obtaining employment in a commercial baking/cooking setting-- Gwendolyn had been placed in the same job sites for three years doing mundane and monotonous tasks that were not improving her baking/cooking skills. More specifically, Nashoba placed Gwendolyn at a local business's cafeteria where she performed routine food preparation. In such settings, Gwendolyn was assigned menial tasks that she and Plaintiff felt were below her abilities and did not develop her transition level skills to her potential. Gwendolyn's parents ultimately concluded that she should be placed in an out of district program that would better prepare her to achieve her career goals. Plaintiff met with the faculty and staff of Nashoba on an almost monthly basis to learn about Gwendolyn's progress, and she frequently expressed her strongly felt concern that Gwendolyn was not receiving adequate vocational training and off-site job opportunities in her chosen field of baking and cooking.

<u>Alternative out of district placement to which Gwendolyn was entitled to
provide her a FAPE in the LRE</u>

During the relevant period, the Minuteman Regional Vocational Technical School

District ("Minuteman") offered a vocational education to high school students in its educational

facility located in Lexington, Massachusetts which is a thirty-minute drive from Gwendolyn's

home. Minuteman offered culinary arts vocational training in its classroom shops with

commercial baking equipment and restaurant grade facilities. Gwendolyn could not be directly

enrolled at Minuteman.

The "LABBB Collaborative" is a collaborative of Massachusetts municipal school

districts, including Lexington, Arlington, Burlington, Bedford, and Belmont that was created to

serve students with special education needs from the aforementioned base districts and

approximately seventy sending districts.  It provides services to a wide range of students with

disabilities from the age of three up to the age of twenty-two.  The LABBB Collaborative

accepted out of district students at Minuteman who were entitled to take advantage of both that

collaborative and that school district's vocational and academic programming. The referring

school district paid a tuition for the student. Students in the LABBB Collaborative programming

at Minuteman were offered vocational training and access to the same shop classroom facilities

offered to Minuteman's directly enrolled students. The LABBB Collaborative programming at

Minuteman offered vocational internships and off-site job training in commercial bakeries and

restaurants performing actual cooking and baking.  Upon completion of its enrolled students'

programming at Minuteman, LABBB Collaborative students were provided with job placement

services and opportunities in the culinary arts in commercial bakeries and restaurants.  The

LABBB Collaborative also provided academic services to enrolled special education students,

including, where appropriate, preparation for taking the Commonwealth's MCAS tests so that said students could earn a high school diploma.

Nashoba could have referred and placed Gwendolyn in the LABBB Collaborative programming at Minuteman but did not do so.  Starting in May 2017, Plaintiff requested a reference to place Gwendolyn at another school where she could receive a FAPE which was reasonably suitable for her potential in the LRE, including the LABBB Collaborative programming at Minuteman. Nashoba failed to respond to such requests.

## Administrative Proceedings

### The Hearings before the BSEA Officer[4]

Pursuant to Massachusetts law, disputes between school districts and students and/or their parents regarding FAPE's in the LRE, including placement determinations, are submitted for resolution to the BSEA. On June 22, 2018, Gwendolyn and Plaintiff filed an appeal with the BSEA because Nashoba had refused to refer Gwendolyn for a publicly funded placement at the LABBB Collaborative programming at Minuteman ("BSEA Appeal"). The specific relief requested in the BSEA Appeal was placement in the LABBB Collaborative programming at Minuteman, transportation to that programming (as she was currently receiving to NRHS), and an award of compensatory services time after she reached the age of twenty-two. The appeal was assigned to BSEA Hearing Officer Sara A. Berman ("Berman" or "hearing officer").

On the first day of hearings, the LABBB Collaborative Executive Director, Patrick Barbieri ("Barbieri"), testified as to the opportunities afforded to suitable special education students who were referred, and then placed in its programming at Minuteman.  Barbieri further

---

[4] While Gwendolyn's mother has brought this action individually and, on her behalf, both of her parents pursued the appeal before the BSEA.  Because there is no substantive difference, I may at times use the term "Plaintiff" when referring to both of Gwendolyn's parents.

testified that referring school districts paid his collaborative $61,000 a year for this out of district

placement.  By the morning of the second day of hearings, September 14, 2018, it had become

reasonably clear that Gwendolyn was entitled to at least some of the relief that Plaintiff had

requested. Late that morning, Joan DeAngelis, the Nashoba administrator in charge of its special

education programming ("DeAngelis") and Nashoba's attorney agreed to settle Gwendolyn's

BSEA Appeal by referring her for placement at the LABBB Collaborative programming at

Minuteman.  Plaintiff believed from the context of these settlement discussions, that the referral

was for a fully funded placement of Gwendolyn in the LABBB Collaborative programming at

Minuteman and covered all aspects of the relief requested by Plaintiff in the BSEA Appeal, other

than her claim for compensatory services time. Consequently, Plaintiff agreed to suspend and

continue the hearings so that Gwendolyn could be placed in the LABBB Collaborative

programming at Minuteman, leaving the issue of her entitlement to compensatory services time

from Nashoba for a later hearing date.

> After the hearings were suspended on September 14, 2018, Plaintiff learned from a listed

witness (Connie Benjamin) who was a former employee of Nashoba and was present and ready

to testify that day, that prior to Nashoba's agreement to settle most of Gwendolyn's outstanding

issues, she had informed Nashoba's attorney that she would be testifying to a number of

occurrences which may have violated Gwendolyn's rights which she observed while she was

working at Nashoba.[5]  As a result of the settlement reached on September 14, 2018, Plaintiff had

released Connie Benjamin from testifying.

---

[5] These alleged violations included, but were not limited to, exposing Gwendolyn to the terrifyingly violent and disturbingly obscene behaviors of two other students in the transitions program classroom, one of which regularly engaged in furious outbursts that caused students in the transition classroom to be cleared, and one of which constantly exposed himself and touched himself obscenely, often in full sight of the home-style kitchen where Gwendolyn was expected to perform on-site cooking and baking activities. These fellow students who exhibited violent and obscene behaviors had been removed from the transitions program classroom shortly before the commencement of the BSEA Appeal.

Gwendolyn was processed and approved by Nashoba for placement at the LABBB Collaborative programming at Minuteman.  She continued to receive instruction from Nashoba during this time. By October 25, 2018, the LABBB Collaborative had processed Nashoba's referral for placement at Minuteman and was awaiting an acceptance letter from Nashoba to effectuate the placement. During this period, Plaintiff's attorney (Gwendolyn's father) made frequent requests of Nashoba's attorney to get Nashoba to act upon the acceptance letter and effectuate the settlement agreement. Ultimately, the parties could not agree on the terms of the settlement and it fell through. Consequently, further hearings were scheduled.

Minuteman had given notice to the LABBB Collaborative at the beginning of the 2018-2019 school year that it would not renew that collaborative's contract for programming in the following school year. Thus, when the hearings reconvened placing Gwendolyn in the LABBB Collaborative programming at Minuteman was no longer an option.  Therefore, at the continued hearings, Nashoba focused on providing Gwendolyn with transition level skills in the transitions program at NRHS during the 2018-2019 school year.

Plaintiff and other Nashoba current and former employees testified at the continued hearings that Gwendolyn's social skills deficits were caused by her frustration with the menial, non-culinary tasks she was forced to perform each school day for over three years, her lack of confidence in Nashoba's programming that she believed was not preparing her for employment in her chosen field, and her prior exposure to violent and disturbingly obscene behaviors by other Nashoba students.

The BSEA Decision

The hearing officer issued her decision on May 17, 2019 (the "BSEA Decision"). In a

detailed, thoughtful, and comprehensive opinion, the BSEA hearing officer rejected

Gwendolyn's parents' contention that the IEPs and placement provided by Nashoba were

inappropriate and further rejected their contention that procedural irregularities by Nashoba and

the LABBB Collaborative entitled Gwendolyn to compensatory services. At the same time, the

hearing officer concluded that Gwendolyn was entitled to "a comprehensive transitional

evaluation … which shall include a thorough assessment of [her] current vocational skills, needs

and interests, particularly in her preferred field of cooking and baking."

**Discussion**

Plaintiff's Entitlement to Attorney's Fees

In Count III of her Complaint, Plaintiff seeks reimbursement of attorney's fees as the

prevailing party at the BSEA level.  Nashoba argues that Plaintiff was not the prevailing party

with respect to her BSEA Appeal and therefore, this count must be dismissed. Plaintiff asserts

that by virtue of the BSEA hearing officer's order directing that Gwendolyn was entitled to a

comprehensive transitional evaluation, which this Court ordered enforced in the PI Decision, she

is a prevailing party. She requests that this Court permit further  briefing on the issue of her

entitlement to attorney's fees based on her prevailing on her request for injunctive relief asserted

in Count VI.

Plaintiff did achieve modest relief from the hearing officer who concluded that

Gwendolyn was entitled to a comprehensive transitional evaluation.  As pointed out by Nashoba,

this was not the relief which Plaintiff requested in the BSEA Appeal.  Moreover, in ordering that

Nashoba send Gwendolyn to the LABBB Collaborative for such evaluation, the Court pointed

11

out that both parties were at fault for the lengthy delay in Gwendolyn obtaining the evaluation

and that Nashoba had not acted in bad faith.  Based on Plaintiff's allegations and her limited

success, which would be reflected in any attorney's fees awarded, it is questionable as to whether

she can be considered a prevailing party. However, on this record, I cannot find that Plaintiff has

not at least stated a plausible claim for  attorney's fees, *de minimis* as that award might be.

Therefore, Nashoba's motion to dismiss Count III is denied.

<u>Whether Plaintiff's Rehabilitation Act Claim should be Dismissed</u>[6]

Plaintiff alleges that Nashoba discriminated against Gwendolyn in violation of section

504 of the Rehabilitation Act by depriving her of educational benefits to which she was

entitled.  More specifically, Plaintiff contends that Nashoba's failure to furnish Gwendolyn with

an appropriate FAPE constituted unlawful discrimination based upon her disability.  Nashoba

asserts that Plaintiff's Section 504 claim is subsumed within her IDEA claim, *i.e.*, Plaintiff's

discrimination claim under Section 504 is not separate or distinct from her claim under the IDEA

that Gwendolyn was denied a FAPE, and therefore, must be dismissed. In response, Plaintiff

argues that a Rehabilitation Act claim can be asserted independently of a claim under the IDEA

and can be made out by allegations of either bad faith or gross mismanagement of a student's

---

[6] The IDEA stipulates that claims brought under the Rehabilitation Act seeking relief available under the IDEA are subject to the same administrative exhaustion requirements as claims brought directly under the IDEA. 20 U.S.C. § 1415(*l* ). The First Circuit has construed this provision broadly to include claims that seek monetary relief not available under the IDEA. *See Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 64 (1st Cir.2002). Additionally, the First Circuit has broadly interpreted the interests subject to protection under the IDEA, and has correspondingly found that the exhaustion requirement, is triggered whenever a claim relates "to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *Weber v. Cranston Sch. Comm.,* 212 F.3d 41, 51 (1st Cir. 2000)(citation to quoted authority omitted). It is not clear to me that Plaintiff has exhausted her administrative remedies with respect to her Section 504 claim (the hearing officer's decision makes no more than a passing reference to Section 504.  Neither party has raised the issue and given that I am granting Nashoba's motion to dismiss for failure to state a, claim, it is not necessary for me to address it at this time.

education that falls outside professional standards. She contends that Nashoba's failure to place Gwendolyn in the LABB transition program met the standard for stating such a claim.

"[A] discrimination claim under the Rehabilitation Act … involving a denial of a FAPE is not coextensive with an IDEA claim. To prevail on an IDEA claim, a plaintiff must show that he or she has a qualifying disability and has been denied a FAPE. To prevail on a discrimination claim under the Rehabilitation Act … involving a denial of a FAPE, a plaintiff must make an additional showing that the denial resulted from a disability-based animus. *D.B. ex rel. Elizabeth B. v. Esposito,* 675 F.3d 26, 40 (1st Cir. 2012)(internal citations omitted).[7] Thus, to state a claim in this case, Plaintiff must plausibly allege that Gwendolyn: (1) is a "qualified individual with a disability; (2) was either excluded from participation in or denied the benefits of [the school's] services, programs or activities, or was otherwise discriminated against; and (3) that such exclusion ... or discrimination was by reason of [her] disability." *Parker v. Universidad de P.R.,* 225 F.3d 1, 5 (1st Cir. 2000).

Based on the allegations in the Complaint which includes the hearing officer's decision, Plaintiff has failed to state a plausible claims for violation of the Rehabilitation Act because she fail to allege that she was excluded from participation in or denied the benefits of a FAPE by reason of her disability. On the contrary, the record establishes that Gwendolyn's parents and Nashoba disagreed as to whether the transitions program in which Gwendolyn was enrolled at Nashoba provided her with all the services required under the IDEA. Plaintiff's allegations fall

---

[7] Section 504 of the Rehabilitation Act requires that "no ... individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in ... any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see also* 34 C.F.R. 104.4. As applied to public education, Section 504 requires that disabled children have equal access to educational opportunities that non-disabled children enjoy. *Id.* In addition, under Section 504, if parents dispute the school district's identification, evaluation, or placement of disabled students, an impartial hearing must be held. 34 C.F.R. 104.36.

far short of stating a plausible claim that Nashoba engaged in bad faith or mismanaged the

provision of Gwendolyn's transition services.

In her opposition Plaintiff asserts that even if her Section 504 discrimination claim is

dismissed, she can prevail on a claim for retaliation under Section 504. Plaintiff acknowledges

that she did not expressly allege a retaliation claim but contends that her Complaint and the

attached exhibits make out a more than plausible claim for retaliatory conduct. Little time need

be spent on this argument. Plaintiff's thirty-five-page Complaint is completely devoid of any

factual assertions that would support a plausible claim for retaliation under Section 504. *See*

*Johnson v. Shelby,* 135 S.Ct. 346, 347 (2014)(plaintiff need not expressly allege they are brining

section 1983 claim to survive dismissal so long as factual aversions in complaint plausibly claim

a civil rights violation). Put another way, while under *Johnson* Plaintiff is not required to

expressly plead legal theories, she is required to alleged facts which would support a legal claim.

<u>Section 1983 Claim</u>

Plaintiff has asserted a claim against Nashoba under Section 1983 for violation of

Gwendolyn's rights while she was in the transitions program by exposing her to two students who

violent, disruptive, obscene and disturbing. Plaintiff alleges that Nashoba's actions knowingly and

created a dangerous environment which resulted in Gwendolyn suffering emotional and

psychological damage and as a result, she was less able to consistently modify her own behavior[8].

Plaintiff further alleges that the deprivation of Gwendolyn's rights was "consistent" with

Nashoba's custom or policy and/or the deprivation of those rights resulted from acts or omissions

---

[8] The record evidence suggests that certain negative behavioral characteristics ascribed to Gwendolyn were considered when determining what educational services were appropriate for her.

of those administrators and faculty who were responsible for Nashoba setting policy in its transition classroom.[9]

Nashoba argues that Plaintiff's Section 1983 claim must be dismissed because she has failed to allege that it violated any of Gwendolyn's federal constitutional rights. While the heading of Count V references a claim for violation of Gwendolyn's due process rights, I agree that the claim itself is devoid of any legal allegations expressly supporting such a claim. However, the Complaint alleges that Gwendolyn was deprived of educational rights as the result of being placed in a classroom with two violent and disruptive students who engaged in obscene behavior. Under *Johnson,* these factual assertions are sufficient to permit an inference that Plaintiff is asserting a claim for violation of Gwendolyn's substantive due process rights.[10] Nashoba further argues that

---

[9] Because Plaintiff asserts that Nashoba exposed Gwendolyn to an environment that effectively denied her the educational services to which she was entitled, she arguably was also required to exhaust this claim by raising it in her BSEA Appeal. Whether this claim was exhausted is a close call-- the claim was not expressly asserted in the appeal, however, the underlying factual allegations were raised during the latter stages of the hearing. As with Plaintiff's Section 504 claim, it is not necessary for me to resolve this issue.

[10] To state a claim for violation of Gwendolyn's substantive due process rights, she "must demonstrate an 'abuse of government power that shocks the conscience' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.'" *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st Cir. 2001). As noted by Nashoba, Plaintiff faces significant hurdles in prevailing on such a claim: " 'the Due Process Clause of the Fourteenth Amendment ... does not transform every tort committed by a state actor into a constitutional violation. '[T]he Due Process Clause ... was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression. Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. It follows from this that the government is under no general constitutional duty to protect individuals from the harmful conduct of third parties." *Willhauck v. Town of Mansfield,* 164 F. Supp. 2d 127, 132 (D. Mass. 2001)(internal quotations and citations to quoted case omitted)(almost every federal court to have faced issue has held that, because parents still maintain primary responsibility for child, compulsory school attendance does not create a sort of special relationship that would trigger heightened protection under due process clause). There are limited exceptions to the general rule and at this stage of the proceedings, I do not find that as a matter of law the allegations fail to state a plausible claim for violation of Gwendolyn's substantive due process rights. *But see Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 297 (D. Mass. 2017)(as general matter, courts have declined to find "special relationship" between public school and its students; "shock-the-conscience" test is extremely demanding one, and challenges analyzed under it rarely succeed).

15

even if the Complaint can be read to assert such a claim, its motion to dismiss should be granted because Plaintiff has failed to allege a plausible claim against it under *Monell*. I agree.

To state a Section 1983 claim against a municipality, a plaintiff must show that "the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95, 98 S.Ct. 2018 (1978). Thus, the plaintiff is required to demonstrate both the existence of a policy or custom and a "direct causal link" between that policy and the alleged constitutional deprivation. *Harris,* 489 U.S. at 385, 109 S.Ct. 1197; *see also Monell,* 436 U.S. at 694, 98 S.Ct. 2018 (policy must be the "moving force [behind] the constitutional violation"); *Santiago v. Fenton,* 891 F.2d at 373, 381–82 (1st Cir. 1989). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson,* 563 U.S. 51, 61, 131 S.Ct. 1350 (2011).

To impose liability against Nashoba under *Monell*, Plaintiff must establish that "the custom [is] attributable to the municipality. That is, it must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice. [Additionally], the custom must have been the cause of and the moving force behind' the constitutional violation. Although liability may not be imposed on a municipality for a single instance of misconduct by an official without final policymaking authority, liability may be imposed on a municipality for a single decision by a final policymaker. " *Doe v. Town of Wayland,* 179 F. Supp. 3d 155, 171–72 (D. Mass. 2016)(internal quotation marks and citation to quoted cases omitted). Plaintiff's conclusory and vague allegations that actions of "administrators or faculty" being "consistent with [Nashoba's] custom or policy,

16

and/or the deprivation of those rights resulted from acts or omissions of those administrators and faculty who were ultimately responsible at Nashoba for setting policy in its transition classroom," *see Complaint,* at ¶138, are insufficient to state a plausible *Monell* claim against Nashoba. Accordingly, Nashoba's motion to dismiss Plaintiff's section 1983 claim is granted.[11]

### Conclusion

Defendant Nashoba Regional School District's Partial Motion To Dismiss (Docket No. 38) is ***granted***, in part, and ***denied,*** in part, as provided in this Order.

 **SO ORDERED**

 */s/ **Timothy S. Hillman***
 TIMOTHY S. HILLMAN
 DISTRICT JUDGE

---

[11] Nashoba further contends that Plaintiff's Section 1983 claims must be dismissed to the extent that she seeks to recover for Gwendolyn's emotional distress and seeks individual damages on her own behalf. While these arguments have merit, it is not necessary for me to address them.