# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARIA del ROSARIO, on behalf of and as Guardian and Parent of GWENDOLYN BURKE, <br> Plaintiff, <br><br> v. <br><br> NASHOBA REGIONAL SCHOOL DISTRICT, and BUREAU OF SPECIAL EDUCATION APPEALS, <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CIVIL ACTION <br> No. 19-40107-TSH |

## MEMORANDUM AND ORDER OF JUDGMENT
### March 30, 2023

**HILLMAN, S.D.J.**

### Background

Maria del Rosario, as Guardian and Parent of Gwendolyn Burke ("Plaintiff") has filed a

Complaint against Nashoba Regional School District ("Nashoba") and the Bureau of Special

Education Appeals ("BSEA"). She is appealing the BSEA's decision that she has not met her

burden of demonstrating that the individual placement programs provided for her daughter

Gwendolyn Burke ("Gwendolyn") by Nashoba were inappropriate, or that Gwendolyn was

entitled to compensatory services (Count I), and seeking reimbursement of attorney's fees and

costs from Nashoba (Count III).[1]

---

[1] Plaintiff's claims for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C, § 794 (Count IV) and the federal civil rights act, 42 U.S.C § 1983 (Count V) were previously dismissed by the Court. *See* Memorandum of Decision and Order, dated November 24, 2020 (Docket No. 82).  The Plaintiff voluntary dismissed her claim appealing the hearing officer's BSEA decision on the grounds that it was invalidated by procedural, statutory, constitutional and/or other violations (Count II). *See* Stipulation of Dismal (Docket No. 130). The Court

This Memorandum and Order addresses Nashoba Regional School District's Motion for Summary Judgment (Docket No. 104). For the following reasons, that motion is *granted*.

### Standard of Review

In reviewing the Hearing Officer's Decision, this Court "reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. However, [t]hat independence is tempered by the requirement that the court give due weight to the hearing officer's findings." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35–36 (1st Cir. 2012)(internal quotation marks and citation to quoted case omitted). Consequently, this "[C]ourt's review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard, an intermediate level of review that has been "characterized … as one of involved oversight." *Id.* (internal quotation marks and citation to quoted case omitted omitted). [2]

### The Legal Landscape: Nashoba's duty to provide Gwendolyn with transition level skills, training, and vocational opportunities suited to her potential.

Plaintiff is the court-appointed guardian and a parent of  Gwendolyn. Nashoba is a duly chartered regional school district with a principal location in Bolton, Massachusetts. The "BSEA" is part of the Massachusetts Division of Administrative Law Appeals. Gwendolyn is a highly functioning woman on the autism spectrum with a documented diagnosis of learning

---

previously granted Plaintiff's claim seeking an injunction ordering Nashoba to arrange for an immediate, independent vocational and daily living evaluation of Gwendolyn Burke (Count VI). *See* Memorandum of Decision and Order On Plaintiff's Motion for Preliminary Injunction, dated December 5, 2019 (Docket No. 42)("PI Order").

[2] The standard of review in an IDEA appeal differs from that applied in most other agency actions where the district court's review is limited to the administrative record and is *highly* deferential.  Moreover, while the Court is deciding this case in the context of a summary judgment motion, the usual standard of review applicable to such motions does not apply as the First Circuit has noted that "as in other administrative appeals, a motion for summary judgment in an IDEA case is simply a vehicle for deciding the relevant issues, and the non-moving party is not entitled to the usual inferences in its favor. Nor does the presence of disputed issues of fact preclude the award of summary judgment." *Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d 79, 84–85 (1st Cir. 2012)(internal citations omitted)(district court's review of IDEA appeal on motion for summary judgment is more akin to a bench trial conducted on a stipulated record).

disability. At the time suit was filed, Gwendolyn was 22 (she is now 25).  Gwendolyn is disabled as defined by one of more of the subsections of the Individuals with Disability in Education Act ("IDEA"), 20 U.S.C. §1400 *et seq.,* in accordance with federal and state law. As a result of her disabilities and because she and her parents were residents of the Nashoba school district, Gwendolyn received special education services from Nashoba for almost two decades pursuant to federal and state statutes and regulations.

Under applicable federal and state statutes and regulations in effect, the school district where a child with a disability resides has financial and programmatic responsibility for providing that student's special education until the child reaches the age of twenty-two. Moreover, school districts are required to provide that student with a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") with meaningful parent involvement in designing the student's individualized education program ("IEP")[3], including placement options and other important procedural safeguards.  Federal regulations also require school districts to provide older disabled students such as Gwendolyn with a coordinated set of services designed to be within a results-oriented process. That process is focused on improving the academic and functional achievement of the child in order to facilitate the child's movement from school to post-school activities. These included postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation. These mandated transition services must be based on the individual child's needs, considering the child's

---

[3] The term FAPE means a that the handicapped child shall receive educational instruction specifically designed to meet his or her unique needs, "supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Board of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89, 102 S.Ct. 3034 (1982).   The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with IDEA.

strengths, preferences, and interests. Additionally, Massachusetts regulations require school districts to provide programs for eligible students ages eighteen through twenty-one years, including continuing education; developing skills to access community services; developing independent living skills; developing skills for self-management of medical needs; and developing skills necessary for seeking, obtaining, and maintaining jobs.

Under applicable federal and state law, a school district that is unable to provide a reasonably adequate FAPE in the LRE, including mandated transition services, is required to offer the student free out of district placement at another school that will provide them with such reasonably appropriate services.  Where an IEP provided by the district denied the student a FAPE the student *may* be entitled to compensatory educations. *See Johnson v. Bos. Pub. Sch.*, 201 F. Supp. 3d 187, 202 (D. Mass. 2016), *aff'd,* 906 F.3d 182 (1st Cir. 2018)(where a disabled child misses "warranted" education because the IEP "was so inappropriate that he was effectively denied a FAPE", compensatory education may be awarded; compensatory education, however, is "not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA" (citation to quoted cases omitted)).


[Remainder of Page Intentionally Left Blank]

## Facts[4]

### Gwendolyn's Placement in Nashoba's Transition Program

Gwendolyn  cognitive abilities are in the average range. She has been diagnosed with autism Spectrum Disorder ("ASD") , Pervasive Developmental Disorder ("PDD"),and Attention Deficit Hyperactivity Disorder ("ADHD"). Gwendolyn's PDD impacts her communication, generalizing, attending, transitioning, social/emotional development pertaining to interactions with adults and peers and, overall behavior in the school environment. Her PDD and ADHD affect her receptive, expressive and social language skills, which have an impact on her understanding of language in all environments. Gwendolyn's attention difficulties, compulsive tendencies and impulsivity impact her learning across settings.

Gwendolyn attended Nashoba Regional High School ("NHRS") in Bolton, Massachusetts from 9th to 12th grade. Upon completing the 12th grade in May 2016, she received a Certificate of Completion. Thereafter, Gwendolyn received special education services from Nashoba in its Transitions Program ("Transitions") at NRHS. Transitions is multi-focused on the various

---

[4] This Court's Local Rules provide that the party moving for summary judgment shall file a concise statement of material facts which it deems undisputed with page references to affidavits, depositions and other documentation. LR, D.Mass. 56.1.  The party opposing summary judgment is required to file a *concise* statement of the material facts of record as to which it is contended there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. *Id.* Plaintiff has responded to Nashoba's statement of material statement of undisputed facts by admitting or denying Nashoba's asserted facts. However, when denying Nashoba's factual assertions, Plaintiff has not cited to evidence supporting her contention that the fact is disputed. *See* Plaintiff's Response To The Statement Of Facts In Support The Motion Of Defendant Nashoba Regional School District For Summary Judgment (Docket No. 117).  To the extent that Plaintiff has failed to cite to evidence in the record to support her denial, the Court has accepted Nashoba's asserted facts (which are backed up by the administrative record). Additionally, Plaintiff has filed a statement of facts she alleges are in "opposition" to Nashoba's statement of material facts. Plaintiff's filing is not a statement of facts which she contends are in dispute rather it is statement of facts which she contends are undisputed, filing of which is not provided for in LR, D.Mass. 56.1. However, given the posture of this case (review of an IDEA appeal), the Court finds it appropriate to consider Plaintiff's factual assertions to the extent *relevant and supported by the administrative record. See supra,* note 2.

While in making these findings of fact the Court has considered the statements of fact submitted by the parties, the Court, as it is required to do, has independently reviewed the administrative record in reviewing the Hearing Officer's/BSEA's decision to determine first, the factual record is accurate and complete and second, whether the decision is supported by the administrative record. Finally, to the extent that the parties' have put their own self-serving spin on the evidence in the record, the Court has not adopted their factual assertions.

aspects of preparing students for post-secondary life, including independent skills, adaptive life skills, vocational training, interpersonal communication, self-advocacy and decision making. The goal of Transitions is to provide a variety of job opportunities and vocational experiences so that students can obtain gainful employment (though not necessarily within a specific profession). Transitions is where in-district special education students are generally placed after they turn eighteen until they reach the age of twenty-two. The students attend a variety of job sites during the week, but never commercial bakeries or kitchens. During the time they are in the classroom, they focus on individual IEP objectives. Prior to entering Transitions, Gwendolyn received services in a substantially separate program, but was still integrated with typical peers (non-special education students) in a number of her classes. There were no other non-special education students (typical peers) in the Transitions classroom during Gwendolyn's placement.

Gwendolyn demonstrated ability and enthusiasm for work in the culinary field, particularly for baking and cooking; her career objective was to be employed as a chef in a commercial bakery or restaurant. While she was a student in its Transitions Program, Nashoba provided Gwendolyn with routine opportunities for developing her culinary skills and her vocational goals.  Gwendolyn's strong skills for cooking and baking and her clearly defined goals in these areas were unique in contrast to other students during her first two years at Transitions.

In Transitions, Gwendolyn had the following vocational placements: Bose Corporation Cafeteria, Meals on Wheels, NRHS Snack Shack, Corcoran House Assisted Living, Leominster Crossings Assisted Living, Strand Theatre, Stow Greenhouse, and Center Elementary School first grade teacher's helper. She exercised the following vocational skills at these work sites: food preparation in three different commercial kitchens, cleaning and sanitizing

cooking areas, assembling meals following allergy information, making positive connections
with Meals on Wheels recipients, stocking shelves including rotating products, clearing and
setting up dining rooms, light custodial tasks, planting bulbs and flowers, folding boxes for
shipping, and reading to young children. Gwendolyn was never furnished academics while in the
Transitions, despite Plaintiff's requests. Plaintiff was told by Nashoba staff that she could work
on reading and math with Gwendolyn at home.

 Since before 2016 and though the spring of 2018, Plaintiff met with the faculty and staff
of Nashoba on an almost monthly basis to learn about Gwendolyn's progress. Plaintiff frequently
expressed her strongly felt concern that Gwendolyn was not receiving adequate vocational
training and off-site job opportunities in her chosen field of baking and cooking.

<u>Alternative out of district placement to which Gwendolyn was entitled in order to
provide her a FAPE in the LRE</u>

 Gwendolyn's parents were interested in enrolling her at the Minuteman Vocational
Technical School in Lexington, Massachusetts ("Minuteman") through the  "LABBB
Collaborative" (or "LABBB"). The LABBB is a collaborative of Massachusetts municipal
school districts, including Lexington, Arlington, Burlington, Bedford, and Belmont that was
created to serve students with special education needs from the aforementioned base districts and
approximately seventy sending districts.  At the time, the LABBB serviced a wide range of
students with disabilities from the age of three to the age of twenty-two. The LABBB accepted
out of district students for placement at Minuteman who were entitled to take advantage of both
that collaborative and that school district's vocational and academic programming when the
referring school district paid a tuition for that student. There are six high school programs within
the LABBB and LABBB has a substantially separate special education classroom within

Minuteman. LABBB students follow a schedule whereby they have one week of academics followed by one week focused on vocational skills.

On October 12, 2016, Plaintiff emailed the director of Gwendolyn's IEP Team, Anne Neylon ("Ms. Neylon"), and requested that Nashoba contact the Executive Director of the LABBB so that the family could explore Minuteman as a possible placement for Gwendolyn. In response, Ms. Neylon recommended reconvening Gwendolyn's IEP Team, which was responsible for making decisions and recommendations about programming. In November 2016, at an IEP Team meeting, Nashoba maintained that Transitions provided Gwendolyn with a FAPE in the LRE.  Consequently, Nashoba did not contact the LABBB.

On May 24, 2017, Gwendolyn's IEP Team held an annual review meeting and proposed an IEP and placement for the 2017-18 school year. Gwendolyn's parents expressed their belief that her needs could better be met outside of Nashoba and requested that the IEP meeting be reconvened before the end of the school year for the purpose of discussing out-of-district placement options.  Ms. Neylon informed them they would first have to respond to the proposed IEP, and if rejected, could then request a meeting to discuss those portions with which they disagreed. On June 1, 2017, Gwendolyn's father wrote Ms. Neylon and requested a placement meeting. On June 6, 2017, Gwendolyn's parents received proposed IEP for 2017-18; they thereafter emailed Ms. Neylon indicating an intent to reject both the IEP and placement.

Nashoba did not receive the rejected IEP and placement in time to reconvene Gwendolyn's IEP Team prior to the end of the school year and a placement  meeting therefore could not be held.  Additionally, Plaintiff (Gwendolyn's legal guardian) never actually signed the rejected IEP and placement.  Gwendolyn then attended Nashoba's Extended School Year Services ("ESY") program during the summer of 2017. She remained in Nashoba's Transition

program during the 2017-18 school year and during the summer of 2018.  On May 9, 2018,

Gwendolyn's IEP Team held an annual review meeting after which an IEP covering May 9, 2018

to May 8, 2019 was issued. On June 21, 2018, Gwendolyn's father, acting as her attorney, filed a

request for hearing before the BSEA ("BSEA Appeal").

The BSEA Appeal[5]

Pursuant to Massachusetts law, disputes between school districts and students and/or their

parents regarding FAPE's in the LRE, including placement determinations, are submitted for

resolution to the BSEA. The specific relief requested by Plaintiff in the BSEA Appeal was

Gwendolyn's placement in the LABBB Collaborative programming at Minuteman,

transportation to that programming (as she was currently receiving to NRHS), and an award of

compensatory services time after she reached the age of twenty-two. On June 27, 2018, Nashoba

requested a postponement of the hearing to schedule a pre-hearing conference. As agreed by the

parties, a prehearing conference was scheduled for September 5, 2018, with the hearing to be

conducted on September 13 and 14, 2018. The appeal was assigned to BSEA Hearing Officer

Sara A. Berman ("Hearing Officer").

The issues for hearing were the following: 1) whether the IEPs for May 2017-

May 2018 and May 2018-May 2019, as well as the corresponding placement in

Nashoba's Transitions program were reasonably calculated to provide Gwendolyn with a FAPE;

2) If not, whether the LABBB Collaborative program at Minuteman and Lexington High School

school would be appropriate for Gwendolyn such that she should be placed there prospectively;

---

[5] While Gwendolyn's mother has brought this action individually and, on her behalf, both of her parents pursued the appeal before the BSEA.  Because there is no substantive difference, I may at times use the term "Plaintiff" when referring to both of Gwendolyn's parents.

and 3) whether Nashoba committed procedural violations such that Gwendolyn was entitled to compensatory services.

Hearings on Plaintiff's BSEA appeal began on September 13, 2018.  On the second day of the hearings the parties entered settlement negotiations to refer Gwendolyn to her preferred placement, the LABBB at Minuteman. The BSEA hearing was  adjourned pending settlement with the issue of compensatory damages to be revisited at a later date.  On September 24, 2018, Gwendolyn's father requested a new hearing date in November 2018 in order to complete the application process for Gwendolyn at Minuteman—the request for postponement was granted. On October 29, 2018, Gwendolyn was accepted into the LABBB Collaborative at Lexington High School. The LABBB recommended that she attend that campus during the weeks she received academic instruction as it was deemed a better "social fit" for her than Minuteman's academic program. On  November 1, 2018, Nashoba proposed a settlement agreement to which Plaintiff made a counter proposal. Ultimately, the parties' were unable to agree on all terms of the agreement, and Gwendolyn was not placed with the LABBB Collaborative. The hearing then resumed on November 28, 2018.

On January 14, 2019, Gwendolyn's father filed a motion requesting that Nashoba place Gwendolyn at the LABBB Collaborative for sixty days in order to report back at a continued hearing date with testimony of her suitability for the program. That request was denied as was a motion for reconsideration requesting the Nashoba place Gwendolyn at the LABBB Collaborative to conduct a forty-day evaluation. Ultimately, the hearings concluded on March 27, 2019.

<u>The Hearing Officer's Decision</u>

The Hearing Officer's Decision (the "Hearing Officer's Decision") can be found attached as *Exhibit F*, to the Complaint (Docket No. 1). In this section, the Court has included only those findings made by the Hearing Officer that are relevant to the contested issues and are in addition to those already included in the Court's prior findings (although for context purposes there may be some redundancy). Additionally, while summarizing the Hearing Officer's Decision, for the most part, the Court has related her findings verbatim utilizing the terminology used by her rather than the Court's defined terms (the references should be apparent to the reader). While some modifications were made to condense the Hearing Officer's findings, the substance of the findings remains the same. The Court has included additional findings made by the Hearing Officer in the context of it discussion of the merits of Plaintiff's claims.

Student is a 21-year-old young woman with disabilities who is a resident of a town served by the Nashoba. The parties agree that Student needs and is entitled to post-high school transitional services from Nashoba until July 2019, when she will reach the age of twenty-two. The parties agree that Student is an outgoing, charismatic, creative young woman with a great sense of humor. She shows initiative and is hard-working and persistent. Student has many interests and activities, including singing, dancing, theatre (she has performed in both school and community theatre productions), and the Best Buddies program, where she has done fundraising and taken leadership roles. Since mid-high school, Student has had a passion for culinary arts, especially baking. She has been involved successfully in cooking and baking ventures in school, where she has produced and sold baked goods to staff at holiday times.

Parents and Student report that she has worked and/or learned independently in multiple out-of-school culinary experiences they have secured for her, without job coaches or other supports, and with non-disabled co-workers. Parents further report that Student's supervisors and instructors in these settings have been pleased with her work and there have been no complaints about her behavior. In her home, Student prepares family dinners, independently, one or two days per week, and bakes cakes, pies, and other desserts for her family. She recently demonstrated a baking recipe on a community access cable television program. Student has acquired many of her skills from watching You Tube videos and television cooking programs such as Food Network.

Student has long-standing diagnoses of ASD[6] and ADHD, which affect her skills in multiple areas, including learning, communication, generalization, transitions, receptive and expressive language and social interactions. In the employment context, Student's challenges affect her ability to work as part of a team, to accept criticism or feedback as well as to perform non-preferred tasks or work with people whom she does not like, without making rude comments. Student also has struggled to understand and accept that she has disabilities, especially autism, and this struggle has interfered with her ability to self-advocate for assistance.

Student's most recent school-based evaluation was conducted in 2015, and based on psychological, educational, speech-language, and transition/life skills assessments, the evaluator noted that she was pleasant and conversed easily and had relative weaknesses in receptive language as well as in problem-solving in unfamiliar or anxiety-provoking situations. Student was also found to have demonstrated strengths in many areas, including personal management, safety, social interactions, and use of kitchen tools and appliances. Her vocational strengths were in computer and kitchen skills.

Student has spent her entire educational career in Nashoba schools. For grades 9 through 12, she was enrolled in the Life Skills program at NRHS, where she spent the majority of each day in substantially separate classrooms, attended some general education classes, and was involved in several general education extra-curricular activities such as drama and two choral groups. According to her mother, Student "thrived" in high school.

In May 2016, near the end of Student's 12th grade year, the Team developed an IEP covering May 2016 to May 2017 (including summer 2016) which provided for the Student to move on from Nashoba's Life Skills program to it Transitions program. Parents accepted the IEP in full and consented to the placement on July 13, 2016.Pursuant to the accepted IEP, Student began Transitions at the start of the 2016-2017 school year. She continued to attend during 2017-2018 and 2018-2019. Her program over these years has included classroom instruction in functional academics and independent living skills, participation in inclusion activities (e.g., Unified[7] health and chorus) within NRHS, placement at job sites, speech/language therapy and counseling. Throughout her time in Transitions, Student's job sites have included a corporate cafeteria, the dining rooms at two senior assisted living facilities[8], Meals on Wheels, a local movie theatre, a nursery and a Nashoba elementary school. Additionally, Student has worked within NRHS, at the snack stand in cafeteria

---

[6] The Hearing Officer found that according to Plaintiff, the diagnosis of PDD was made when Gwendolyn was a small child.

[7] Unified programs at NRHS are open to Transitions, Life Skills, and general education students, and include courses and activities such as chorus, athletics, and P.E./health.

[8] Gwendolyn's duties included bussing tables, setting out menus, filling water pitchers and refilling condiment jars. In 2018, at Gwendolyn's request, one of the senior living facility job sites was eliminated.

and in an office. Student has worked at the corporate cafeteria, the assisted living facilities and the elementary school for most or all the past three years.

Student's job duties at the corporate cafeteria have included placing items on trays such as cookies, croissants and muffins, placing pizza slices on pans to prepare for baking, filling taco shells, dishwashing, and other, similar tasks. At the assisted living centers, Student has set and cleared tables in the resident dining rooms and cleaned up after meals. The Meals on Wheels job entailed assembling meal items, and then traveling with a driver and carrying the prepared meals from the vehicle to the homes of recipients on the route. The movie theatre job consisted of sweeping floors in the lobby. At the elementary school, Student was assigned to first and second-grade classrooms where she read books to the children and assisted the teacher with routine classroom tasks. The snack vendor job consisted of stocking the shelves and cooler, as well as checking for and removing expired items. While the corporate cafeteria job included food handling, none of the job placements involved any major food preparation.

NRHS staff had identified "soft skill" deficits manifesting at job sites and elsewhere which needed to be addressed with Student. Specifically, Student would make negative comments to peers if she did not like what they were doing or to supervisors if asked to do a task that she felt was "beneath" her, become tearful in challenging situations, or fail to follow supervisors' directions on completing a task. Shortly after Student began attending Transitions, Parents became concerned that her job placements were not preparing her for her chosen career. At some time during the fall of 2016, Parents toured Minuteman and observed part of a culinary arts shop. Parents then contacted Ms. Neylon to inquire about looking at other programs "to make sure that [Nashoba's Transitions program] is working to the maximum extent possible." In particularly, Parents requested they be able to see what the LABBB Collaborative in Lexington had to offer. Ms. Neylon replied that placement decisions are made through the IEP Team meeting process and suggested that the Team reconvene. At the subsequent IEP meeting held on November 16, 2016, Parents stated that they wanted to visit the LABBB Collaborative, and asked Nashoba representatives to ask LABBB to allow them to visit, without a formal referral or endorsement, since LABBB generally does not allow parents to view its programs without a referral or some type of permission from the district of residence. Nashoba, through Ms. Neylon declined as it continues to maintain that the program at the high school is appropriate for Student.

At the hearing, when asked why Nashoba declined to grant permission for Parents to explore the LABBB, Ms. Neylon testified that if a student's parents are interested in looking at a school which the Team would not go forward with unless the district has approved, the IEP Team would not give permission for the parents to visit that school. Ms. Neylon had not checked with the  Massachusetts Department of Elementary and Secondary Education ("DESE") about such a

policy and never seen any regulation that states a district can prevent a student or the student's parents from exploring out of district placements. As to who makes the decision whether out-of-district placements should be considered, Ms. Neylon testified that it is the Team in general, but the ultimate decision maker would be herself as IEP Team chair. Thus, if the IEP Team decides that the appropriate placement was to continue at a district school, parents who wanted to explore out-of-district placement and needed to get permission from the IEP Team to do so (and therefore, would not be able to pursue the out-of-district placement).

Nashoba issued a quarterly progress report on January 17, 2017 which indicated that Student had made measurable progress in her Social Communication goal, increasing her ability to participate in conversations about non-preferred topics as well as to evaluate when it is appropriate to interrupt. She also made progress towards her Vocational goal, performing tasks in the corporate cafeteria and assisted living dining room almost entirely independently, and had a very low incidence of negative comments.  In February 2017, at Nashoba's request, Frank R. Robbins, Ph.D., from Quabbin Valley Educational Consultants, LLC, observed Student in Transitions. Nashoba had sought Dr. Robbins' recommendations for Student's programming in light of her parents' expressed concerns. According to Dr. Robbins' report, he reviewed the results of Student's 2015 re-evaluation and observed her for a total of slightly more than two hours across school and community-based activities.

In his Summary and Recommendations, Dr. Robbins stated that Student had many strengths and skills, but, at that time, had little understanding of her own social/emotional challenges. Her vocational progress was impeded by difficulty taking feedback from school staff or supervisors. He concluded, however, that based on his observation, Student clearly was capable of "taking feedback appropriately and being a productive and pleasant employee." Dr. Robbins recommended that Student continue in Transitions, which he deemed to be of high quality, with the following adjustments: (1) introduction of a visual checklist linking work-related and social/behavioral skills to Student's future career goals; (2) counseling work with Student to help her understand her strengths and weaknesses; (3) video recording of Student at work sites so that she could later review her facial expressions and verbalizations and practice corrections; (4) introduction of changes to her work evaluation sheets; (5) replacing work sites that Student did not like with a small number of sites that Student could visit multiple times per week so that she could practice the same skills with the same supervisor; (6) relabeling Student's program from "Transitions" to "Work Experience," and (7) having her spend increasing amounts of time outside of the school building. Dr. Robbins stated "it would be great if a work site at a local bakery could be obtained." The record does not indicate whether Nashoba incorporated any of Dr. Robbins' recommendations. Transitions staff attempted to find a bakery work site but were unable to do so. Nashoba Team members were concerned about eliminating non-preferred work

sites because they felt Student needed to be able to function in many types of environments.

On May 31, 2017, after a Team meeting,  Nashoba issued an IEP covering May 24, 2017 to May 23, 2018.  Documents attached to the IEP included the following information. First, that Student's parents' had requested that the Team reconvene to discuss an out of district placement for Student and to invite representatives from Minuteman to the meeting; Nashoba agreed to investigate this request. Second, that Parents wished to have Student work in a bakery setting every school day. Nashoba indicated that it has vocational settings that include culinary options (e.g., Corporation cafeteria, Meals on Wheels), but that it had not been able to secure a specific vocational site at a bakery. Nashoba further stated that Cooking and baking continue to be part of the programming within the Transitions program and the program continues to focus on employment skills while significantly emphasizing interpersonal relationships.

In the IEP itself, the statement of "Parent and/or Student Concerns" stated that Student's parents "expressed concerns regarding her behavior which they feel is regressing. They feel this is due to her being unhappy in her current programming as they report she is bored and doesn't feel that she is making progress in achieving her goals." The IEP contained updated goals in the areas of "Communication," "Vocational," "Counseling," and "Independent Living." Benchmarks for the Vocational goal included increasing consistency of work and compliance "across preferred and non-preferred staff and co-workers," listening to entire instructions before beginning tasks, writing and editing business letters, working on preparations to take the ServSafe Examination,[9] and maintaining high quality work and employee interactions while staff proximity decreases, and developing a business plan.  Since beginning at Transitions, Student has been working on ServSafe by studying the instruction manual and taking practice tests, with the support of Transitions staff members.

Counseling benchmarks included confining Student's expression of frustration to appropriate times and places, identifying and discussing concerns affecting her job performance, and discussing her emotional state with her counselor. Independent Living benchmarks included improving Student's neatness and organization of her cooking space, increasing her finance skills such as budgeting, accurately estimating the time required for cooking tasks, increasing personal safety skills, self-advocating for accommodations, and improving emotional self-regulation. The IEP provided for 450 minutes per cycle of "academic/social skills", with the remainder of services comprised of individual speech/language therapy and counseling in addition to sub-separate classroom and community activities.

---

[9] According to NHRS witnesses, individuals seeking to work in food preparation occupations increase their employment opportunities if they receive certification in the ServSafe program, which is written instruction and tests regarding food-related sanitation and hygiene.

While there was discussion between Ms. Neylon and Student's parents regarding a further IEP Team meeting, Parents had informed Nashoba that they intended to request a hearing before the BSEA; Nashoba indicated they would provide their responses to Parents rejected portions of the IEP at the hearing. Parents then sent an email to Ms. Neylon informing her that they rejected Student's proposed IEP and placement, requested a placement meeting and stated that they would be delivering there completed IPE responses.  Due to the timing on when Parents' documents were delivered, no further Team meetings took place at the end of the 2016-17 school year.

A quarterly progress report issued on June 20, 2017 indicated that Student had made some progress in her work site independence and behavior but was still making inappropriate comments, in a loud voice, to her job coach or her employer at the corporate cafeteria, her least favorite job site. She was performing her actual tasks mostly correctly and independently. The report reflected slow progress in most of her counseling, adaptive behavior, and independent living objectives. Student participated in Nashoba's ESY services during summer 2017, which included academic and leisure activities, visits to potential work sites through Best Buddies, and speech/language therapy focusing on conversational and pragmatic skills.

Student attended Transitions for the 2017-2018 school year and summer of 2018. She attended most of the same job site placements as she had attended in the prior two school years. Progress reports issued in November 2017 and in January, April and June 2018 indicated that Student continued slow, steady progress in listed benchmarks, but still struggled with "soft skills" such as interpersonal relationships. In a letter dated May 2, 2018 to Nashoba's Director of Pupil Personnel Services, Joan DeAngelis, Student's parents rejected her "continued placement at the Nashoba Regional High School and District"  and requested a further meeting to discuss [Student's] placement at the LABBB Educational Collaborative and/or the Nashoba Learning Group[10]. Parents also demanded that Nashoba grant permission and/or authorization for Student and her parents to view then proposed alternative learning collaboratives. The letter went on to suggest scheduling the placement meeting jointly with the previously scheduled annual review meeting on May 9, 2017.

On May 9, 2018, the Team convened for Student's annual review as referred to above. On May 15, 2018, Nashoba issued an IEP covering May 9, 2018 to May 8, 2019. This IEP generally continued the goals and benchmarks from the prior IEP and continued her placement in Transitions. For the most part, Student continued in the same in-school activities and job-site placements in which she had been involved for the prior two school years.  The record does not indicate if and when Parents responded to the proposed IEP and placement; however, they filed the hearing request in the instant case, which contested the appropriateness of that IEP, on June 21, 2018.

---

[10] Student's parents did not pursue a referral to the Nashoba Learning Group.

In or about November 2018, the School sought consent to conduct Student's three-year re-evaluation. There is no evidence on the record as to whether Student's parents consented to the re-evaluation or whether it has taken place.

Transitions is housed within NRHS, is designed to prepare young adults aged approximately 18-21 with post-high school instruction and community experiences, including vocational experiences on various job sites, to increase their ability to obtain and keep employment, as well as to function independently within the community. The program is not designed to prepare students to enter particular trades; rather, its purpose is to teach skills that can be applied to any occupation, as well as skills needed to increase independence in other aspects of adult life. Programming is highly individualized and tied to the goals of each student's IEP.

At the time of the hearing, Transitions was serving approximately seven students between the ages of 18 and 21, most or all of whom were on the autism spectrum.  Transitions program components include a classroom staffed by a special education teacher, three paraprofessionals, and related services staff including a Board-Certified Behavior Analyst (BCBA), speech-language, occupational, and physical therapists, and counselors. These and other staff members meet weekly to consult with each other regarding each student's progress. Within the Transitions classroom, students participate in functional academics (including, for example, personal finances) and independent living skills (including budgeting, cooking, and shopping), driven by their IEPs. Students leave the classroom for community experiences such as shopping, as well as for recreational activities. Students also have "unified" activities within NRHS, including music, sports, band, physical education, and  cooking/crafts. With respect to vocational experiences, the Program has approximately 15 job sites with cooperating businesses and organizations. Students may have two or three job placements at one time and may rotate through several different placements during the course of the school year. Transitions staff members serve as job coaches and will provide students with a greater or lesser amount of support depending on their needs. A primary goal of the work component of the program is to instruct students in skills that can be generalized to any employment setting, such as punctuality, independence getting to and from work as well as on the job, task completion, following instructions, teamwork, accepting feedback, appropriate interactions with co- workers, supervisors, and customers, and the like. Students are supported by Transitions staff on the job to a greater or lesser degree depending on their needs and performance. For most students, the goal is to fade staff support as students become more independent.

Student's lead teacher, Stephanie Redmond, testified about Student's current routine, during the 2018-2019 school year, including her job placements, Transitions classroom work, work on IEP objectives, including, for example,

"self-disclosure," (i.e., understanding her disability and self-advocacy for accommodations), organization and planning (preparing a recipe following all directions), and preparing for the ServSafe examination,[11] academic activities and community activities (such as a trip to a bank, bowling alley or restaurant). Ms. Redmond also gave detailed testimony based on her performance at the various worksites of Student's demonstrated strengths included self-motivation and initiation for preferred tasks (such as those involving food), completing assigned tasks on a list, and friendliness with work site staff. Challenges include interpersonal skills in large groups, such as decision-making about dividing tasks among team members, flexibility with co-workers, and her occasional refusal to do non-preferred tasks.

Since her first year in Transitions, Student has done weekly cooking and baking projects in the small kitchen located in the Transitions classroom, and has developed a small baking business where she sells baked goods to high school employees before several holidays during the school year. Pursuant to IEP benchmarks, with the assistance of classroom teachers and assistants, Student has worked on the various components of this activity, including finding recipes, budgeting for and buying ingredients, following recipes, taking holiday orders from staff, producing, packaging, and distributing completed orders, and collecting payment.[12] Between her first and second years in Transitions, Student, with staff help, applied for and received a grant to purchase kitchen equipment to be used in the Transitions kitchen for this baking project.[13]

According to Ms. Redmond, Student has made progress in her various IEP benchmarks during the 2018-2019 school year. For example, Student has updated her employment cover letter using online tools, has continued to progress through the ServSafe manual, has progressed in updating her recipe book, and has advanced her skills in budgeting, computer use, and "self- disclosure" of her disability-related needs. As of December 2018, Ms. Redmond stated that on a scale for rating a student's level of independence on job sites from being least independent to being fully independent, Ms. Redmond testified that Student's independence level fell somewhere in the middle.

---

[11] In her statement of facts, Plaintiff suggests that Nashoba did not take steps to assist Gwendolyn in obtaining her ServSafe Certification. However, her own recount of the record belies this contention.

[12] In practice, Gwendolyn was required to prepare budgets only intermittently.

[13] In her statement of facts, Plaintiff states that the Hearing Officer found that the level of these baking opportunities never increased throughout Gwendolyn's three years in Transitions.  This is s misstatement of the Hearing Officer's findings. In fact, the Hearing Officer found that "[w]hile the Transitions kitchen does not replicate a commercial facility, Student has used it to work on a variety of culinary projects *of increasing complexity, with increasing independence.*" *See Hearing Officer's Decision*, at p. 26. During this period, Gwendolyn also worked in a corporate cafeteria doing tasks related to food preparation. It was this placement as to which the Hearing Officer found there was little increase in the difficulty level of the tasks to which she had been assigned (food preparation). *Id*. Moreover, the Hearing Officer found that none of the *offsite* placements, including the cafeteria, permitted Gwendolyn to do any actual cooking or baking.

Student has attended the corporate cafeteria, assisted living, snack vendor, and elementary classroom sites for her entire tenure at Transitions. Student's interests in food preparation were factored into the job site selections.  Student has received individual and small group speech-language services approximately twice weekly during all three school years in Transitions. She has continued to get training on social communication skills both within the classroom and on job sites. It was reported that Student has made steady progress in these areas during 2017-2018 and 2018-2019, but continues to need work on reacting appropriately to being corrected or asked to do a task she does not want to do in the moment (both in preferred and non-preferred settings).

A Nashoba school psychologist who conducted Student's psychological evaluation in 2015, and who also has been involved with Student during all of her time in Transitions and a special education teacher/consultant both testified that Student's job placements were necessary and appropriate for her to learn and generalize "soft" social skills such as accepting feedback and handling frustration.

Parents called as witnesses two former Nashoba employees who had worked with Student in Transitions, Paulette Clark and Connie Benjamin. Ms. Clark is a BCBA in private practice who was employed by Nashoba from 2004 to March 2018. Ms. Clark had worked directly with Student in Transitions from September 2017 until she left the district in March 2018, but had known Student since third grade from other positions she had held within Nashoba. Ms. Clark testified that while she was working with Student, she came to believe that Student was not being placed in appropriate job sites that focused on her areas of interest, cooking and baking. Rather, Student was cycling through the same job placements for years at a time, because Nashoba was dedicating too few staff members to job site development and supervision. Ms. Clark stated that because of Nashoba's staffing decisions, Student had few opportunities to develop her strong interests and skills in cooking and baking. Ms. Clark stated that she had communicated her concerns to Nashoba's special education administrators on multiple occasions, to no avail.[14]

Connie Benjamin had worked for Nashoba as a special education paraprofessional from approximately 2010 or 2011 until approximately December 2017. She holds a bachelor's degree but holds no educational degrees or certifications.  In her capacity as a special education classroom paraprofessional, Ms. Benjamin worked with Student and her classmates in the Life Skills program for three years, corresponding to Student's tenth, eleventh and twelfth grade years. She worked in Transitions during portions of Student's first and second years in that program, supporting all the students in their classroom and job site activities. Ms. Benjamin did not attend Team meetings or weekly staff consultation meetings but was familiar with each student's IEP. During the time Ms. Benjamin worked in Transitions, the program served between nine and eleven students, and was staffed by a lead teacher and four paraprofessionals.

---

[14] Ms. Clark's resignation from Nashoba in March 2018 was under less than amicable circumstances.

Ms. Benjamin testified that Student informed her daily that she wanted to be a baker and a chef when she finished school, that she frequently complained about her various job placements, but generally complied with her responsibilities. Ms. Benjamin also testified that Student struggled to get along with some peers and supervisors and needed to make progress in this area. Ms. Benjamin did not feel that Student got sufficient opportunities to bake and expressed this opinion to Ms. Clark as well as to Student's classroom teacher; on the other hand, she felt that Student learned important life skills from all of her job placements, including tolerance of other people, persistence with non-preferred tasks, and the like. Overall, Ms. Benjamin had no opinion as to whether Transitions, taken as a whole, was appropriate for Student.

For part of the time that Student was in Transitions, she had two classmates who acted inappropriately—one had frequent, sometimes violent, outbursts (when these occurred, all students were generally directed out of the room until the situation came under control), and another who would regularly disrobe in the bathroom adjacent to the classroom cooking area, and sometimes exposed himself in the classroom. Ms. Benjamin testified that Student found the former behavior upsetting (she feared for the safety of staff members), and while she initially found the latter behavior unsettling, she quickly learned to disregard it and proceed with her own work.[15]

Student testified that she had been attending most of her job placements, performing essentially the same tasks, for the past three years. She testified that she felt she was learning some new skills in areas such as customer relations but did not believe that the tasks she was given at job sites were helping advance her cooking or baking skills.[16]

### _The Hearing Officer's Decision and the Subsequent Related Proceeding Before this Court_

The Hearing Officer issued her decision on May 17, 2019 concluding that the "Parents did not meet their burden of demonstrating that the IEPs and placement provided by Nashoba were inappropriate." She also determined that she could "not conclude that Nashoba and LABBB committed procedural violations warranting an award of compensatory services." At the same time, she did find that Gwendolyn was entitled to a transitional evaluation and ordered "therefore, that Nashoba, in collaboration with Parents, shall arrange for a comprehensive transitional evaluation of Student, which shall include a thorough assessment of Student's current vocational skills, needs, and interests, particularly

---

[15] These two students had been removed from the Transitions classroom shortly before the commencement of Plaintiff's BSEA Appeal. Plaintiff's claims against Nashoba based on Gwendolyn's exposure to such incidents have been previously dismissed by the Court.

[16] The Hearing Officer also made findings regarding the proposed program at the LABBB Collaborative. Given the Court's ruling (upholding the Hearing Officer's determination that Nashoba provided Gwendolyn with appropriate IEPs during the relevant period) it is not necessary to include those findings.

in her preferred field of cooking and baking." She further ordered that the evaluation commence immediately upon the parties' receipt of her decision.

As a result of continued disputes between Plaintiff and Nashoba regarding who should conduct Gwendolyn's comprehensive transitional evaluation, it had not been completed by the time that Plaintiff filed suit in this Court on August 15, 2019.  As part of her suit, the Plaintiff requested injunctive relief whereby the Court would order that the comprehensive transitional evaluation would be conducted by the LABBB collaborative. On December 5, 2019, the Court granted Plaintiff's motion. *See generally* PI Order. The evaluation was thereafter completed at the LABBB collaborative.

## Discussion

Gwendolyn is an individual with a disability who was eligible for special education and

related services pursuant to IDEA and the Massachusetts special education statute, Mass.Gen.L,,

ch. 71B ("Chapter 766") and, therefore, was entitled to a FAPE  in a program capable of

providing her meaningful educational benefits in the LRE[17].  While parents and adult students,

such as Gwendolyn, are entitled to participate in the IEP process, they cannot dictate the terms of

the IEP and schools have professional discretion and flexibility in how they fulfill their

obligation to provide the student with a FAPE within the LRE.  The IEP may be challenged by a

student or parent by seeking a hearing before the BSEA.  Any party aggrieved by the BSEA's

decision may seek judicial review of such decision, including an order of compliance for a

decision that is not being implemented. *See Michelle K. v. Pentucket Reg'l Sch. Dist.*, 79

F.Supp.3d 361, 369 (D. Mass. 2015)(BSEA has jurisdiction to resolve disputes under IDEA and

Section 504; BSEA's decision may be appealed to state or federal court).

---

[17] Under federal law, at a minimum, the child is entitled to "instruction and support services sufficient to permit [her] to benefit educationally from that instruction."  *Nickerson-Roti v. Lexington Pub. Schools,* 893 F.Supp.2d 276, 285 (D.Mass. 2012)(citation to quoted cases and internal quotation marks omitted). Under Massachusetts law, the child is entitled an education "that assures the maximum possible development." *Id.* (citation to quoted case and internal quotation marks omitted).

In this case, Plaintiff challenges the BSEA's decision that Gwendolyn was not denied a FAPE in the LRE during the May 2017-May 2018 and May 2018-May 2019 school terms and that she is not entitled to compensatory services.  More specifically, Plaintiff asserts that the Hearing Officer's decision was wrong because the record evidence "clearly" shows that Nashoba's failure to augment Gwendolyn's vocational training was due to Nashoba's inadequate staffing which should have had no bearing on the Hearing Officer's  determination of whether Gwendolyn was provided with meaningful transitional level benefits[18].

The Plaintiff also alleges that the Hearing Officer failed to consider that Nashoba's IEP failed to meet the "pyramiding requirements" in the DESE Advisory. That Advisory states that the IEP for individuals receiving transitional services should provide a plan for developmental progression so that each year the student builds new skills that move them closer to achieving their secondary goals.[19]  Specifically, Plaintiff argues that the Hearing Officer ignored the DESE's Advisory's suggestion that school districts explore innovative partnerships with special education collaboratives that can offer professional resources. The Plaintiff also argues that the Hearing Officer did not consider Nashoba's failure to comply with federal regulations and the DESE Advisory requiring school districts to provide older special education students with postemployment opportunities in a systematic fashion. Plaintiff further seeks attorneys' fees as the prevailing party in this suit.[20] Nashoba seeks summary judgment on the grounds that the

---

[18] First, Plaintiff's allegation regarding "inadequate staffing" by Nashoba is conclusory with no substantive record support (the only evidence of supposed "inadequate staffing" was the limited testimony of a former Nashoba employee which was not relied on by the Hearing Officer in making her determination), and the argument itself is so vague and confusing as to make little sense. Therefore, the Court will not further address this assertion.

[19] Plaintiff suggests that only a vocational high school could have met Gwendolyn's needs.

[20] In her memorandum, Plaintiff asserts that she is entitled to Attorney's Fees in accordance with the Court's prior order on Nashoba's motion to dismiss. *See Mem. of Dec. and Order*, dated November 24, 2020. The Court agrees with Nashoba that in denying Nashoba's motion to dismiss it did not rule that Plaintiff was entitled to attorneys' fees, rather the Court denied the motion to dismiss on the grounds that even if the Court were to affirm the Hearing Officer's Decision, Gwendolyn might be entitled to a limited award of attorneys' fees with respect to that part of the Hearing Officer's Decision finding that she was entitled to a transition assessment, that is, she stated

Hearing Officer's decision is supported by the administrative record, and therefore, it is entitled

to judgment, as a matter of law.

<u>Gwendolyn's Challenge to the Hearing Officer's Determination that the 2017-2018 and 2018-2019 IEPs provided by Nashoba were Appropriate, and to the Hearing Officer's Determination that she was not entitled to Compensatory Services</u>

*<u>Whether the 2017-2018 and 2018-2019 IEPs were Appropriate</u>*

After Gwendolyn received a certificate of completion upon finishing the twelfth grade at

Nashoba, she required additional services, *i.e.,* transition services, until she reached the age of

twenty-two. The IDEA defines "transition services" as follows:

> The term "transition services" means a coordinated set of activities for a child
> with a disability that—
>
> (A) is designed to be within a results-oriented process, that is focused on
> improving the academic and functional achievement of the child with a disability
> to facilitate the child's movement from school to post-school activities, including
> post-secondary education, vocational education, integrated employment
> (including supported employment), continuing and adult education, adult services,
> independent living, or community participation;
>
> (B) is based on the individual child's needs, *taking into account the child's
> strengths, preferences, and interests*; and
>
> (C) includes instruction, related services, community experiences, the
> development of employment and other post-school adult living objectives, and,
> when appropriate, acquisition of daily living skills and functional vocational
> evaluation.

20 U.S.C. § 1401 (34)(emphasis added).

Plaintiff was satisfied with the education that Gwendolyn received until approximately

May 2017 when she was placed in Transitions. Plaintiff ultimately objected to that program on

---

a plausible claim for attorneys' fees. Notably, Nashoba first raised its argument that Plaintiff could not recover attorneys' fees because Gwendolyn's father represented her throughout the proceedings in a reply brief, and Plaintiff responded in a sur-reply brief. The Court did not address these arguments in its ruling and left the final determination of Plaintiff's claim for attorneys' fees to be decided on summary judgment. *See Echavarria v. Roach,* 565 F. Supp. 3d 51, 82 (D. Mass. 2021)(purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum, rather a party may use a reply brief to clarify arguments previously made or to respond to an argument an opposing party raises in an opposition). That claim is now ripe for ruling.

the grounds that it was not adequately preparing her to achieve her long-term goal of obtaining employment in a commercial baking/cooking setting. Nashoba, on the other hand, asserts that at all times, it provided Gwendolyn with appropriate services which meet IDEA's requirements.

Plaintiff asserts that Gwendolyn was denied a FAPE in the LRE because the IEPs put in place by Nashoba for 2017-18 and 2018-19 failed to provide Gwendolyn with the progressive education to which she was entitled and failed to give sufficient consideration to sending her to a collaborative program. In making this argument, Gwendolyn's parents focus primarily (if not solely) on the fact that Transitions was not equipped to train Gwendolyn in a *commercial* baking setting. However, the evidence before the Hearing Officer amply supported the finding that Transitions provided an opportunity for Gwendolyn to bake and cook in a non-commercial setting. Gwendolyn developed a business where she sold baked goods to school employees. In the process, she learned how buy ingredients, budget, take orders and payments, and package and distribute her goods. Ms. Redmond testified as to Gwendolyn's progress in updating her cover letter and recipe book using online tools, calculating a fixed monthly budget and recipe budget, worksite safety and obtaining the ServSafe certification.

The record also reflects that Gwendolyn made progress attempting to bake new items and revisiting recipes if something didn't turn out as planned. Gwendolyn's other placements (some offsite, some at the school) and activities in the Transitions program exposed Gwendolyn to food preparation and non-cooking related skills such as working with others, completing assigned tasks, other types of vocational skills (such as cleaning and working in elementary school classrooms), and community experiences. Additionally, the record reflects that the Transitions program helped Gwendolyn make progress in improving her soft skill deficiencies such as accepting feedback, redirection and interacting with other employees. Allyson Bell, a Board-

24

Certified Analyst testified before the Hearing Officer that after reviewing Gwendolyn's progress reports and programming, she found that she was making progress and that the Transitions program was "teaching her many skills, not just the baking skills, that will serve her well in her life."

First, the Court finds that in making her determination, the Hearing Officer applied the relevant federal and state law, including applicable rules and regulations such as the DESE Advisory memoranda cited by the Plaintiff. The Hearing Officer noted that Plaintiff, who has the burden of proof, failed to present any evidence in the form of evaluations or expert testimony stating that the benchmarks and goals set forth in the IEPs in question were inappropriate. After considering all the evidence, the Hearing Officer issued a thorough, comprehensive, and thoughtful decision in which she found that the IEPs at issue conformed with statutory and regulatory requirements for transitions services. For the reasons set forth below, the Court agrees.

The Court finds that while the IEPs put in place by Nashoba for Gwendolyn during the relevant terms did not expose Gwendolyn to a commercial baking setting, they did take her interests into account by exposing her to baking and cooking, food preparation, and the collateral skills necessary to achieve her goals (such as planning, and budgeting). Moreover, the Hearing Officer found, and the record reflects, that her baking and cooking experiences in the Transitions classroom kitchen provided her with a degree of independence and increasingly complex baking projects. Additionally,  the Court finds it of consequence that the IEPs put in place by Nashoba provided Gwendolyn with the skills in "interpersonal relations," workplace behavior, self-regulation, and independences that would help her succeed in *any* employment situation.[21] That

---

[21] Nashoba emphasized the improvement of such "soft skills" in Gwendolyn's IEP given that her disabilities affected her ability to communicate, learn and interact socially, which lead to problems in the

is, not only did the program expose her to food preparation and baking, it provided her with exposure to other transferable skills which could be utilized in her chosen field as well as other work settings, and gave her exposure to other vocational opportunities should she lose interest in cooking and baking, or if for some reason (such as a global pandemic) opportunities for employment in her chosen field became limited or unavailable.

Dr. Robbins, an independent educational consultant, observed Gwendolyn in February 2017 and determined that while Gwendolyn had many strengths and skills, she had little understanding of her own strength and skills and her vocational progress was impeded by her inability to accept feedback from staff or supervisors.  He recommended that Gwendolyn continue in Transitions which he found a high-quality program and made suggestions as to how her IEP could be modified to better address her needs, including that eliminating work sites she did not like and assigning her to a work site at a local bakery, if possible.  While Nashoba was unable to find a bakery work site for Gwendolyn (the record reflects that it attempted to do so), Transitions continued to place Gwendolyn in work sites that would assist in her vocational and emotional grown. Transition staff were reluctant to remove Gwendolyn from non-preferred worksites because they felt she needed to be able to function in many types of environments.

After Dr. Robbin's evaluation, Nashoba put in place an IEP for 2017-18 that continued to provide Gwendolyn an opportunity to bake and cook within the Transitions program *and* focused on other transition service goals such as employment skills and an emphasis on interpersonal relationships.  The IEP also addressed goals in the areas of communications, counseling, and independent living. While Plaintiff rejected the proposed IEP (Gwendolyn's parents were

---

employment context.  More specifically, Gwendolyn struggles when asked to perform tasks she doesn't like, with accepting criticism or feedback and making rude comments to others—all of which hinder her ability to work as part of a team.  The IEP put in place by Nashoba was intended to address these issues.

adamant that the LABBB Collaborative should be explored as the primary option for Gwendolyn's education because it would permit her to work in a commercial baking setting), they did so too late in the school year to reconvene Gwendolyn's IEP Team. The Hearing Officer found that the IEP addressed Gwendolyn's area of need and the benchmarks contained therein were properly tied to Gwendolyn's employment-related functions including her interest in the culinary industry. The Hearing Officer also concluded that the IEP met with DESE Advisories on the implementation of transition services and the Court finds that this determination is supported by the administrative record.

As to Plaintiff's argument that the Hearing Officer ignored the DESE's Advisory that school districts explore innovative partnerships with special education collaboratives such as the LABBB, Nashoba declined to reach out to the LABBB Collaborative (directly or indirectly through Gwendolyn's parents) to determine whether the LABBB Collaborative program at Minuteman was better suited to meet Gwendolyn's career goals. However, given that Nashoba's IEP was appropriate, the Court does not find that Nashoba was under any duty to explore placing Gwendolyn at the LABBB Collaborative as the Court agrees with the Hearing Officer that the issue is whether Nashoba's IEP was inappropriate, not whether Gwendolyn's parents preferred program might be a better fit for her needs and interests.

For the reasons set forth above, I find that the Hearing Officer's determination that Gwendolyn was not denied a FAPE in the LRE is amply supported by record evidence and that Plaintiff has failed to meet her burden to establish otherwise.[22] Therefore, the Court affirms the

---

[22] Because the Hearing Officer found that the IEP in place for the 2017-2018 and 2018-2019 school years were appropriate, she did not evaluate the appropriateness of the LABB Collaborative program for Gwendolyn. In any event, Minuteman had given notice to the LABBB Collaborative at the beginning of the 2018-2019 school year that it would not renew that collaborative's contract for programming in the following school year and therefore, prior to the conclusion of the hearing before the BSEA, the issue of Gwendolyn being placed at the Minuteman program became moot.

Hearing Officer's determination and finds no error in the Hearing Officer's evaluation of the evidence.

<u>*Whether Gwendolyn was Entitled to Compensatory Services*</u>

"Compensatory education is a surrogate for the warranted education that a disabled child may have missed during periods when his IEP was so inappropriate that he was effectively denied a FAPE. Compensatory education, however, is "not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA. Where, as here, there has been no nonfeasance or misfeasance, and the school system has offered the Student a FAPE, Plaintiff's claim for compensatory services cannot survive." *Johnson v. Bos. Pub. Sch.*, 201 F. Supp. 3d 187, 202 (D. Mass. 2016), *aff'd,* 906 F.3d 182 (1ˢᵗ Cir. 2018)(internal citations, quotation marks and citation to quoted case omitted). Where there has been no nonfeasance or misfeasance, and the school system has offered the student a FAPE, a plaintiff's claim for compensatory services cannot survive. See *id.* Accordingly, the Hearing Officer's determination that Gwendolyn was not entitled to compensatory services was not error and is affirmed. *Accord  C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 290 (1ˢᵗ Cir. 2008)(as we have explained, the parents have failed to establish any violation by the school district of its duties under the IDEA; their claim for compensatory education cannot surmount this barrier).

<u>Whether Plaintiff  is Entitled to Recover Attorney's Fees as a Prevailing Party</u>

Plaintiff seeks recovery of attorney fees on the grounds that she is a prevailing party because the Hearing Officer determined that Gwendolyn was entitled to comprehensive transitional evaluation.  Nashoba did not dispute the determination that Gwendolyn was entitled to a comprehensive transitional evaluation, but there was a dispute among the parties as to who would conduct the evaluation.  After hearing, this Court granted Plaintiff's motion requesting

that the LABBB Collaborative conduct the evaluation.  Because the Court has rejected Plaintiff's other claims, the issue is whether the Hearing Officer's determination that Gwendolyn was entitled to a comprehensive transitional evaluation makes her a "prevailing party" entitled to recovery of attorneys' fees. If so, the question becomes whether Plaintiff is entitled to recover attorneys' fees given that Gwendolyn's father, a practicing attorney, represented her throughout the proceeding before the BSEA and in this Court.

### *Whether Plaintiff is a Prevailing Party*

For purposes of recovering attorneys' fees in connection with a BSEA appeal, the Court will award fees to a party who "succeed[s] on any significant issue ... which achieves some of the benefits plaintiffs sought in bringing suit. The party's success cannot be a hollow victory; it must materially alter the litigants' legal relationship by modifying one party's behavior in a way that directly benefits the other. Thus, the change effected must be material; a purely technical or *de minimis* victory cannot confer prevailing party status." *Springfield Sch. Comm. v. Doe,* 623 F. Supp. 2d 150, 162 (D. Mass. 2009)(internal citations, quotation marks and citation to quoted case omitted). The material change in the legal relationship must be the result of a "judicial imprimatur," and it is the party seeking the attorneys' fees that "bears the burden of establishing entitlement to an award." *Doe v. Bos. Pub. Sch.*, 550 F. Supp. 2d 170, 172–73 (D. Mass. 2008)(internal quotation marks and citation to quoted case omitted).

Nashoba asserts that the Plaintiff is not a prevailing party because the relief she obtained (Gwendolyn's undergoing a comprehensive evaluation at Nashoba's expense) did not materially change the legal relationship between the parties. More specifically,  Nashoba argues that Plaintiff did not request the comprehensive evaluation ordered by the Hearing Officer and therefore, she did not achieve success (the Hearing Officer rejected the claims Plaintiff did raise)

and, and the order that a comprehensive evaluation be conducted did not alter the parties' legal relationship because such evaluations are a standard part of transitions services which Nashoba was already obligated to provide (and was prepared to provide).[23]  Plaintiff, who bears the burden of proof, simply makes the conclusory argument that should the Court deny Nashoba's motion for summary judgment, she would be a prevailing party under the statute--- she does not argue or even address whether the Hearing Officer's determination that Gwendolyn was entitled to a comprehensive evaluation constituted a material change in the parties' relationship entitling her to recover attorneys' fees. For that reason, I find that she has waived the issue. *Vargas-Colon v. Fundacion Damas, Inc.*, 864 F.3d 14, 24 (1st Cir. 2017)("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones").[24]

<u>*Whether Plaintiff is Eligible to Obtain Attorney's Fees*</u>

Although it is not necessary, for the sake of completeness I will address Nashoba's assertion that Plaintiff is not entitled to recover attorneys' fees because Gwendolyn's father, a practicing attorney, represented her throughout the proceedings. Plaintiff again addresses the issue in a perfunctory manner. In response to Nashoba's statement that all the Circuit Courts that have addressed the issue have held that under such circumstances, a plaintiff cannot recover attorneys' fees she simply asserts that there is a split of authority without citing to a single case that has held

---

[23] Such evaluations are conducted every three years and in the Fall of 2018, Nashoba had sent a consent to Plaintiff requesting permission for Gwendolyn to undergo her three-year reevaluation, but Plaintiff did not give consent.

[24] Had the Court found it necessary to address the merits of Plaintiffs' claim for attorney's fees, the Court would find that the Hearing Officer's determination regarding Gwendolyn's comprehensive evaluation was indeed *de minimus* and therefore, award of attorneys' fees is not justified.

otherwise.[25] In any event, I agree with the reasoning of those courts that have held that because Gwendolyn's father, a practicing attorney, represented her and Plaintiff for all relevant proceedings, Plaintiff is not entitled to recover attorney's fees.

### <u>Conclusion</u>

For the foregoing reasons, Nashoba Regional School District's Motion for Summary Judgment (Docket No.  104) is ***<u>granted</u>***, and the decision of the BSEA is hereby affirmed in all respects. Judgment shall enter for Defendants Nashoba Regional School District and the Bureau of Special Education Appeals.

<u>*/s/ Timothy S. Hillman*</u>
TIMOTHY S. HILLMAN
SENIOR DISTRICT JUDGE

---

[25]  Even if the Court were to consider Plaintiffs' argument in her sur-reply brief filed in connection with Nashoba's motion to dismiss, she addresses how she believes the Circuit courts that have addressed the issue are wrong or are distinguishable from her case but does not cite contrary authority.